**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re *Ex Parte* Application of Kevin Hellard and Jonathan Thielmann, Joint Trustees in Bankruptcy of Anatoly Leonidovich Motylev, pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding,<br><br>Petitioner. | Misc. Case No. M-  21-mc-864 |

**DECLARATION OF KEVIN HELLARD IN SUPPORT OF**
**PETITIONER'S EX PARTE APPLICATION FOR AN ORDER TO CONDUCT**
**DISCOVERY FOR USE IN A FOREIGN PROCEEDING**
**PURSUANT TO 28 U.S.C. § 1782**

I, Kevin Hellard, being sworn, declare, under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1782, that the following is true and correct:

1.      I am a licensed insolvency practitioner, partner and the Insolvency Practice Leader in the firm Grant Thornton UK LLP ("Grant Thornton").  Grant Thornton is one of the leading accounting and advisory firms in the world.

2.      I reside in London, England and practice out of Grant Thornton's London office.

3.      I am a joint trustee in the bankruptcy of Anatoly Leonidovich Motylev, together with my colleague Jonathan Thielmann (the "Joint Trustees").

4.      I make this declaration based on my own personal knowledge or based upon the information or documents which have been supplied to me, in which case the facts are true to the best of my knowledge and belief.  I respectfully submit this declaration in support of the application for discovery in aid of a foreign proceeding under 28 U.S.C. § 1782 (the "Application").  If called as a witness, I could and would testify to the same as stated herein.

## The English Bankruptcy Proceeding

5.      Mr. Motylev is a Russian national.  In or around July 2015, Mr. Motylev moved from Russia to London, England, where he currently resides.

6.      Mr. Motylev left Russia shortly before the collapse of several banks and pension funds he previously controlled.

7.      Since their collapse, Mr. Motylev has been held personally responsible for a large proportion of the debts owed by those banks, in particular, Russian Credit Bank ("RCB").

8.      In Russia, Mr. Motylev was charged in absentia with the crimes of fraud, embezzlement, money laundering and falsification of accounts of a financial institution. He was subsequently indicted in absentia in Russia for the unlawful extraction of billions of rubles from RCB and placed on the domestic wanted list.

9.      On February 19, 2018, Mr. Motylev was declared bankrupt pursuant to an order of the Arbitrazh Court of the City of Moscow, Russia (the "Russian Bankruptcy Proceedings").  On May 24, 2019, Ms. Anastasia Koldyreva was appointed as the Financial Manager in the Russian Bankruptcy Proceedings (the "Russian Financial Manager").[1]  The role of a financial manager in a Russian bankruptcy is akin to that of an English trustee in bankruptcy.

10.      In September 2020, the Russian Financial Manager commenced proceedings in the England High Court against Mr. Motylev, seeking recognition of the Russian Bankruptcy Order.  Subsequently, the Russian Financial Manager took steps to commence concurrent English bankruptcy proceedings.

---

[1] The Financial Manager was recently replaced.  As of August 2021, Mr. Oleg Ogarkov serves in that role.

2

11.     On October 9, 2020, Mr. Thielmann and I were appointed as Joint Interim Receivers over Mr. Motylev's property pursuant to an order of the English High Court, in order to investigate Mr. Motylev's financial affairs.[2]  Attached hereto as **Exhibit 1** is a true and correct copy of the October 9, 2020 Order.

12.     On November 2, 2020, Mr. Thielmann and I were appointed Joint Trustees in bankruptcy, pursuant to an order of the English High Court (the "English Bankruptcy Proceedings").[3]  Attached hereto as **Exhibit 2** is a true and correct copy of the November 2, 2020 Order.

13.     The appointment of the Joint Trustees was automatically recognized in Cyprus and other EU member states under the Regulation (EU) No 2015/848 of the European Parliament and Council on Insolvency Proceedings, and the Joint Trustees have taken steps in Cyprus to: (i) take control of eight companies Mr. Motylev owns (Stephen Michaelides of Grant Thornton (Cyprus) has been appointed as a director of those companies); and (ii) seek information from individuals / entities based in Cyprus connected to Mr. Motylev.

14.     The Joint Trustees and the Russian Financial Manager are cooperating in the administration of Mr. Motylev's English and Russian bankruptcy estates, with a view to fair administration, efficiency and maximizing overall recoveries.

### Mr. Motylev's Background, History of Fraudulent Transactions, and Creation of Shell Entities

15.     As part of the English Bankruptcy Proceedings, the Joint Trustees are conducting an investigation into Mr. Motylev's background and operations, including the

---

[2] Michael Leeds was also appointed as Joint Interim Receiver; however, he has since resigned from Grant Thornton and is no longer serving in that capacity.
[3] Michael Leeds was also appointed as Joint Trustee; however, is no longer serving in that capacity.

companies, assets, and accounts though which it is believed he perpetrated his fraud.  The following information is either known to the Joint Trustees or believed to be true based on their investigation to date.

*Background*

16.     Mr. Motylev began his financial services career in 1990 at Gosstrakh, the Soviet state insurance company. Gosstrakh was the Soviet predecessor to Rosgosstrakh, Russia's largest insurance company, founded in 1992 and privatized in 2003. Mr. Motylev remained vice president during the transition from Gosstrakh to Rosgosstrakh in 1992 and left Rosgosstrakh in 1995.

17.     In 1992, Mr. Motylev established Globex Bank, one of the earliest Russian joint stock company banks. Mr. Motylev was Globex's chairman, and thereafter its president.

18.     In 1996, Mr. Motylev was arrested and detained by the Russian authorities on suspicion of unlawfully debiting RUB 2 billion from Rosgosstrakh's account at Globex.  No charges were filed, and he was released after approximately one month.  Commentators have claimed Mr. Motylev avoided being charged with the help of the then Russian Minister of Internal Affairs, Andrei Dunaev, who was also a shareholder in Globex at the time.

19.     Globex collapsed in September 2008, purportedly due to the global financial crisis. However various Russian media organizations reported that Mr. Motylev caused the bank's demise when he orchestrated a scheme whereby sham entities incorporated for one day were used to take out loans from the bank for purported real estate investments. These companies were then dissolved, and the funds never repaid to the bank. After Globex's government rescue, it was reported that out of hundreds of Globex's corporate borrowers,

only a few dozens were legitimate.  Attached hereto as **Exhibit 3** are true and correct copies (with translations where necessary) of various publications reporting on Globex's demise and Mr. Motylev's involvement in the same.

20.     Mr. Motylev emerged from Globex's demise unscathed.  He continued to be active in the Russian financial sector, securing a controlling interest in the following banks: RCB; AMB Bank; M-Bank; Tulsky Promyshlennik Bank; and Kompaniya Roznichnogo Kreditovaniya Bank (together, the "Motylev Banking Group"). Mr. Motylev's business interests in Russia also included 7 pension funds: AO NPF Sberegatelnyi; AO NPF Adekta-Pensia; AO NPF Uraloboronzavodskii; AO NPF Zashchita Budushchego; AO NPF Solntse. Zhizn. Pensia; AO NPF Solnechnoye Vremya; and AO NPF Sberegatelnyi Fond Solnechnyi Bereg (formerly known as Sberfond RESO).

21.     Between July 2014 and August 2015, the Motylev Banking Group and the pension funds referenced above all collapsed, and the licenses of these organizations were revoked.

### *Modus Operandi*

22.     After RCB collapsed and was placed into insolvency proceedings, the bank's bankruptcy trustee investigated the bank's operations and discovered a RUB 111.2 billion shortfall between the value of the bank's assets and the creditors' claims, and that Mr. Motylev was responsible for a large portion of that shortfall due to his actions while he controlled RCB. The results of the investigation are set forth in judgments handed down by the Russian Court in the context of RCB's Russian insolvency proceedings (Case No. A40-151915/15-44-257B in the Moscow Court), which are publicly available, and in particular, a judgment of the Court of Appeal. Attached hereto as **Exhibit 4** is a true and correct copy

and translation of the Court of Appeal judgment.

23.     The Court of Appeal judgment describes in detail the manner in which Mr.
Motylev fraudulently extracted funds from RCB.  Mr. Motylev gained control over RCB by
holding several key positions, which prevented any meaningful oversight, and afforded him
"unlimited authority to make all types of transactions on behalf of the Bank, including the
signing of contracts and settlement documents without any restrictions on the amounts."  Ex.
4 at 3.  As a result, shortly before RCB's license was revoked, Mr. Motylev consummated a
number of transactions on extremely unfavorable terms for the bank in order to transfer
assets from the bank to entities he likely owned or controlled.  *Id.* at 2.  He did so by issuing
loans in the total amount of more than RUB 33 billion to shell organizations and executing
credit agreements with those entities, bypassing all of the bank's procedures and due
diligence processes.  *Id.*  As soon as the bank's license was revoked and Mr. Motylev was
out of Russia, "all borrowers without exception . . . stopped servicing [the] loan debt and did
not fulfill their obligations to repay credits." *Id.* at 4.

24.     Since 2017, Mr. Motylev has been on the Russian wanted list.  Between 2017
and 2019, various indictments were issued against Mr. Motylev in Russia concerning his
and his associates' fraudulent extractions of funds from banks within the Motylev Banking
Group.  In particular, on March 29, 2018, Mr. Motylev was indicted under section 4 of
Articles 159 and Article 160 (misappropriation or embezzlement as part of an organized
group or on an especially large scale); under Article 172.1 (falsification of accounting
documents); and under section 4 of Article 174.1 (money-laundering offences).  As part of
the indictment, an investigative report was prepared by the Russian criminal authority (the
"RCB Investigation Resolution").  Attached hereto as **Exhibit 5** is a true and correct copy

and translation of the RCB Investigation Resolution.

25.     The RCB Investigation Resolution details how the funds were extracted from RCB, all following a similar pattern: (i) Mr. Motylev or his associates would seek out nominee borrowers to open accounts with RCB, into which Mr. Motylev or his associates would deposit large loans; (ii) the managers of the nominee borrowers would transfer the loan moneys deposited to accounts held by shell corporations under the control of Mr. Motylev and his associates; (iii) the moneys so transferred would then be moved through a series of accounts with different banks all in the Motylev Banking Group, all in the name of the shell corporations under the control of Mr. Motylev and his associates; and (iv) Mr. Motylev or his associates would conceal this misappropriation through the creation of false transaction documents.  *See* Ex. 5.

26.     Following the above, and Mr. Motylev having been declared bankrupt in Russia, on September 11, 2020, the English High Court issued a worldwide freezing order and on October 9, 2020 appointed English interim receivers over Mr. Motylev's property.

27.     Based on the Joint Trustees' investigation, Mr. Motylev's fraud on RCB appears to be illustrative of his fraud on other banks and pension funds in which he was involved, and which all had their licenses revoked and soon thereafter collapsed.

*The Entities Motylev Owns or Controls That Were Involved in His Scheme Concerning Which Discovery Is Sought*

28.     The Joint Trustees' investigation is still ongoing and they do not have a complete understanding of the extent of the network established by Mr. Motylev, or the transactions entered into by the entities comprising that network.   However, the Joint Trustees are aware of a significant number of companies associated with Mr. Motylev, spanning several jurisdictions, through which very large sums of money have been moved.

It should also be noted that, because of the sensitivities surrounding the Joint Trustees'

investigation and the confidential nature of some of the documents, not every document on

which the Joint Trustees rely in making this Application is appended hereto.  To the extent

the Court wishes to see some of those more sensitive documents, the Joint Trustees can

make them available for in-camera review.

29.     In connection with a different proceeding in 2016, Mr. Motylev made a

disclosure of assets ("List of Assets").  A copy of the List of Assets was provided to the

Russian Financial Manager who provided it to the Joint Trustees.  Attached hereto as

**Exhibit 6** is a true and correct copy of the List of Assets.

30.     In his List of Assets, Mr. Motylev disclosed an interest in 267 companies

(together, the "Disclosed Companies")[4] most of which were incorporated in Cyprus, though

many were incorporated in other jurisdictions including the British Virgin Islands ("BVI"),

Belize, Cayman, Lichtenstein, Luxembourg, the Seychelles, and Turkey.   The Disclosed

Companies engaged in significant financial activity in the period when Mr. Motylev is

alleged to have embezzled funds from the Motylev Banking Group and the pension funds

(leading up to their collapse in 2015). As noted at paragraph 13 above, the Joint Trustees

have taken control of 8 Cypriot Disclosed Companies which appear to have been

particularly active and have installed a new director of those companies.

31.     Based on the Joint Trustees' investigation to date, it appears highly likely that

Mr. Motylev's corporate structure includes additional companies not listed in Mr. Motylev's

List of Assets. Indeed, beyond the companies to which Mr. Motylev has admitted a

connection, the Joint Trustees have identified over 100 companies which are likely either

---

[4] The 267 Disclosed Companies are in addition to the banks in the Motylev Banking Group.

owned or somehow connected to Mr. Motylev.  Prior to the revocation of RCB's license in July 2015, the Disclosed Companies were actively transacting with one another, and also with companies not subsequently acknowledged by Mr. Motylev as being directly associated with him (the "Non-Disclosed Companies"). In the List of Assets Mr. Motylev acknowledged that he was the ultimate beneficial owner ("UBO") of the Disclosed Companies. However, despite this admission, nearly all of the Disclosed Companies' records that the Joint Trustees have reviewed show false UBOs.  The Joint Trustees believe the same may be true of the Non-Disclosed Companies i.e., they will show false UBOs when in fact Mr. Motylev has an interest.

32.     The Joint Trustees make this application in respect of a subset of 21 Non-Disclosed Companies (the "Target Companies") for which the Joint Trustees have been able to identify transactions in U.S. dollars that passed through U.S. correspondent banks.

33.     As mentioned, Mr. Motylev did not disclose an interest in these companies in the List of Assets. However, he is nonetheless connected to the Target Companies through them having received significant loans or payments from Disclosed Companies, and/or having entered into other financial instruments with Disclosed Companies.

34.     The Target Companies collectively received loan fund commitments of $1,054,414,300 from Disclosed Companies, for which there is no commercial rationale. The loans from the Disclosed Companies to the Target Companies were all made without any identifiable security, despite the sums loaned being significant (in the tens and sometimes hundreds of millions of dollars). The loan agreements and financial instruments follow a similar pattern, in that they are generally very brief documents containing little to no explanation of the purpose of the loan or transaction.  Based on our investigation and Mr.

Motylev's *modus operandi*, the Joint Trustees have concluded that the Target Companies are likely either Mr. Motylev's companies or companies owned or controlled by friendly parties who may be holding funds for Mr. Motylev.

35.     There appear to have been significant fund flows denominated in U.S. Dollars from the Disclosed Companies to the Target Companies and tracing those fund flows is likely to lead to recoveries for the bankruptcy estate. I therefore consider it critical to the Joint Trustees' investigations that the transactions of the Target Companies are examined.

36.     The Joint Trustees understand that foreign banks typically use U.S.-based banks to clear dollar-denominated transactions using the Clearing House Interbank Payments System ("CHIPS").  The CHIPS system is used for virtually all dollar-denominated transactions and for transactions where the dollar is used as an intermediate currency to facilitate a currency exchange.  U.S.-based correspondent banks that execute these clearing transactions keep detailed records showing the source and destination for all such transactions.

37.     For each of the below Target Companies, the Joint Trustees seek disclosure from New York-based U.S. correspondent banks of all U.S. Dollar transactions and accounts, with the aim of clarifying what funds were paid to each Target Company pursuant to the below loans and financial instruments, and the onwards movement of those funds.

**Moris Invest Group Ltd. ("Moris")**

38.     Moris, a BVI company, received a significant loan from Raginta Investments Limited ("Raginta"), a Cyprus company which appears to have been one of the key companies within Mr. Motylev's network.  *See* List of Assets, Exhibit 6, at 62 (No. 195).

10

On April 16, 2009, Raginta entered into an agreement to lend $20 million to Moris (the "Raginta-Moris Loan").  Attached hereto as **Exhibit 7** is a true and correct copy of the Raginta-Moris Loan agreement.  The Raginta-Moris Loan agreement is a 2-page document.

39.    Subsequently, through a series of loan amendments, the Raginta-Moris Loan was increased to $400 million.  Attached hereto as **Exhibit 8** are true and correct copies of the amendments to the Raginta-Moris Loan agreement.[5]  Each amendment is a 1-page document.

40.    The Joint Trustees' investigation reveals that of the $400 million Raginta lent to Moris between April 2009 and June 2014 pursuant to the Raginta-Moris Loan, $354,433,553 was not repaid.

41.    The loan documents themselves do not reveal any discernible commercial purpose for the loan. It seems highly unusual that a 2-page agreement with a 1-page addendum, devoid of any security, would be a legitimate basis for memorializing a $400 million loan.

42.    Despite both companies being domiciled abroad, the transactions were denominated in U.S. dollars and thus were transferred through a U.S. correspondent bank. The Raginta-Moris Loan documents contain bank account information for Raginta and Moris.  The loan documents identify Raiffeisen Zentralbank Oesterriech AG ("Raiffeisen") as the correspondent bank.  Based on the Joint Trustees' research, Raiffeisen uses Standard Chartered Bank New York ("Standard Chartered") as a correspondent bank for U.S. dollar denominated transactions. Attached hereto is **Exhibit 9** is Raiffeisen's List of Correspondent Banks, available on its website at https://www.rbinternational.com/de/kunden/institutional-

---

[5] Included are Amendments 2-8; the Joint Trustees are not in possession of Amendment No. 1.

clients/produkte-und-services/cash-

management/_jcr_content/root/responsivegrid/contentcontainer/contentbox/downloadlist.do

wnload.html/0/List%20of%20Main%20Correspondent%20Banks%20for%20Commercial%

20Payments.pdf.  Standard Chartered Bank New York is headquartered at 1095 Avenue of

the Americas New York, NY 10036 United States.

43.      The Joint Trustees seek records of the dollar denominated transactions

associated with the Raginta-Moris Loan, as detailed more fully in the subpoena to Standard

Charted attached to the Application.

**FTP Finance Services Ltd ("FTP")**

44.      FTP is a company registered in the Marshall Islands, at Ajeltake Road,

Ajeltake Island, Majro MH96960. This is the same address as the registered address of at

least eight other companies associated with Motylev.  Like Moris, FTP received a

significant loan from Raginta.

45.      On June 5, 2014, Raginta entered into an agreement to lend $150 million to

FTP (the "Raginta-FTP Loan").  Attached hereto as **Exhibit 10** is a true and correct copy of

the Raginta-FTP Loan agreement.  The Raginta-FTP Loan agreement is virtually identical to

the Raginta-Moris Loan agreement – a 2-page agreement devoid of any security.

46.      The Raginta-FTP Loan was amended once to delete the requirement that all

money be wired to the borrower within 60 days.  Attached hereto as **Exhibit 11** is a true and

correct copy of the amendment to the Raginta-FTP Loan agreement.

47.      The Joint Trustees' investigation reveals that, between June 11, 2013 and

November 6, 2014, at least $52,891,000 was transferred between Regina and FTP pursuant

to the Raginta-FTP Loan.

48.     Like the Raginta-Moris Loan, the Raginta-FTP Loan documents do not reveal any discernible commercial purpose for the loan.  The Joint Trustees have also been unable to identify a legitimate purpose for the loan.

49.     The Raginta-Moris loan documents identify Deutsche Bank Trust Company Americas ("DBTCA") as the correspondent bank for payments denominated in US dollars. DBTCA is headquartered at 60 Wall Street New York, NY 10005.

50.     The Joint Trustees seek records of the dollar denominated transactions associated with the Raginta-FTP Loan, as detailed more fully in the subpoena to DBTCA attached to the Application.

**Renwell Investments Limited ("Renwell")**

51.     Renwell is a Scottish limited partnership that entered into an investment agreement with Raginta on November 27, 2014 (the "Raginta-Renwell Investment Agreement").  Attached hereto as **Exhibit 12** is a true and correct copy of the Raginta-Renwell Investment Agreement.  Pursuant to the Raginta-Renwell Investment Agreement, Raginta was to invest $250 million to assist Renwell with developing property in Russia.

52.     The Joint Trustees have been unable to find evidence that this is legitimate investment or that this property actually exists.

53.     In addition, the registered address for Renwell—Suite 1, 78 Montgomery Street, Edinburgh, EH7 5JA, Scotland—is an address which has been reported as being host to various shell companies used for money laundering.  *See* David Leask and Richard Smith, *The Edinburgh Neighbourhood That's "Home" to a Hive of Illegal Activity and Money Laundering*, The Herald Scotland (Jan. 7. 2018), available at

https://www.heraldscotland.com/news/15811396.edinburgh-neighbourhood-home-hive-

illegal-activity-money-laundering/.  As such, the Joint Trustees believe that this investment was a sham.

54.     The Joint Trustees' investigation reveals that Raginta transferred at least $43,661,438 to Renwell under the Raginta-Renwell Investment Agreement.

55.     In the Raginta-Renwell Investment Agreement, Renwell nominated Commerzbank AG as its correspondent bank.  We believe that Commerzbank AG uses its New York branch for U.S. dollar denominated transactions.  Commerzbank AG New York Branch is located at 225 Liberty Street New York, NY 10281-1050.

56.     The Joint Trustees seek records of the dollar denominated transactions associated with the Raginta-Renwell Investment Agreement, as detailed more fully in the subpoena to Commerzbank attached to the Application.

**Malzinda Management Limited ("Malzinda")**

57.     Malzinda is a Cypriot company which also received a significant loan from Raginta.

58.     Malzinda held a bank account with AMB Bank, one of Motylev's banks in Russia, and was administered by Totalserve like many of the Motylev Disclosed Companies. On September 20, 2011, Malzinda granted a power of attorney to Michael Pozdnyakov to, among other things, open bank accounts on Malzinda's behalf.  Attached hereto as **Exhibit 13** is a true and correct copy of the Power of Attorney.  Pozdnyakov was the chief accountant for Sergei Bondarenko's company, Laurus Services Limited, which assisted with the administration of many of the Motylev Disclosed Companies.  Based on their investigation, the Joint Trustees consider that Sergei Bondarekno was active in assisting Motylev in misappropriating his funds.

14

59.     On October 12, 2011 Raginta agreed to lend Malzinda $15 million (the "Raginta-Malzinda Loan"). Attached hereto as **Exhibit 14** is a true and correct copy of the Raginta-Malzinda Loan agreement.  The Raginta-Malzinda Loan served no commercial purpose.

60.     No correspondent bank is specified in the Raginta-Malzinda Loan agreement. However, the loan agreement does identify Marfin Popular Bank Public Company LTD ("Marfin Bank") for the transaction.  Although Marfin Bank no longer exists, the Joint Trustees' research revealed that Marfin Popular Bank used various correspondent banks for transactions denominated in US dollars:  American Express Bank, New York Agency; Bank of America, New York; Bank of New York; Citibank, DBTCA, HSBC Bank USA, N.A. ("HSBC"), and JPMorgan Chase Bank ("JPM").  *See* Marfin Bank List of Correspondent Banks, https://dokumen.tips/documents/marfin-popular-bank-usd-correspondent-es-popular-bank-usd-correspondent-banks.html.  Bank of America is headquartered at 115 W 42 Street, New York, NY 10036.  Bank of New York is headquartered at 240 Greenwich Street, New York, NY 10286.  Citibank is headquartered at 388 Greenwich Street, New York, NY 10013.  HSBC is headquartered at 452 Fifth Avenue, New York, NY 10018.  JPM is headquartered at 383 Madison Avenue, New York, NY 10017.  American Express Bank was acquired by Standard Chartered in 2008; Standard Chartered's headquarters are identified in paragraph 42, above.  DBTCA headquarters are identified in paragraph 49, above.

61.     The Joint Trustees seek records of the dollar denominated transactions associated with the Raginta-Malzinda Loan, as detailed more fully in the subpoenas to the above-referenced banks attached to the Application.

### Moreland Properties Ltd ("Moreland")

62.     Moreland is a company incorporated in Belize which received a significant loan from Raginta.  On November 11, 2014, Raginta agreed to lend Moreland $10 million (the "Raginta-Moreland Loan").  Attached hereto as **Exhibit 15** is a true and correct copy of the Raginta-Moreland Loan agreement.  The agreement is virtually identical to the Raginta-Moris Loan and the Raginta-FTP Loan agreements; it is another 2-page document, is unsecured, and has no commercial purpose.

63.     Moreover, Moreland's registered address—35 Barrack Road, 3rd Floor, Belize City—is the same address used by other companies associated with Motylev.

64.     In the Raginta-Moreland Loan agreement, Moreland nominated Commerzbank AG as its correspondent bank.  We believe that Commerzbank AG uses its New York branch for US dollar denominated transactions.  The headquarters for Commerzbank's New York branch are identified in paragraph 55, above.

65.     The Joint Trustees seek records of the dollar denominated transactions associated with the Raginta-Moreland Loan, as detailed more fully in the subpoena to Commerzbank attached to the Application.

### Tasouro Management Limited ("Tasouro")

66.     Tasouro is a BVI company that received a significant loan from Raginta. On April 22, 2009, Raginta agreed to lend Tasouro $10 million (the "Raginta- Tasouro Loan"). Attached hereto as **Exhibit 16** is a true and correct copy of the Raginta-Tasouro Loan agreement.  The agreement is virtually identical to the Raginta-Moris Loan, Raginta-FTP Loan, and Raginta-Moreland Loan agreements: a 2-page document devoid of any security, and devoid of commercial purpose.

67.     The Joint Trustees' investigation reveals that at least $7,330,000 of the $10 million was lent under the Raginta-Tasouro Loan agreement, most of which remains unpaid.

68.     No correspondent bank is specified in the Raginta-Tasouro Loan agreement. However, the documents do identify Marfin Bank as Tasouro's bank for the transaction. The U.S. correspondent banks for Marfin are set forth in paragraph 60, above.

69.     The Joint Trustees seek records of the dollar denominated transactions associated with the Raginta-Tasouro Loan, as detailed more fully in the subpoenas to Marfin Bank's U.S. correspondent banks attached to the Application.

**Regional Waters Projects Limited ("Regional Waters")**

70.     Regional Waters is a BVI company that received various loans from Raginta and other Motylev Disclosed Companies.

71.     On January 22, 2009, Raginta (on behalf of Akista Management Limited ("Akista")), a Motylev Disclosed Company, *see* List of Assets, Ex. 8, at 23 (No. 10), agreed to lend $1 million to Regional Waters ("Regional Waters Jan 09 Loan").  Attached hereto as **Exhibit 17** is a true and correct copy of the Regional Waters Jan 09 Loan.  The Regional Waters Jan 09 Loan is a 2-page document and is virtually identical to the loan agreements described above and is devoid of security. Like the other loans, it has no commercial purpose.

72.     On February 23, 2009, Raginta (on behalf of Akista) agreed to lend $200,000 to Regional Waters (the "Regional Waters Feb 09 Loan").  Attached hereto as **Exhibit 18** is a true and correct copy of the Regional Waters Feb 09 Loan.  The Regional Waters Feb 09 Loan is a 2-page document and is virtually identical to the loan agreements described above and is devoid of security. Like the other loans, it has no commercial purpose.

73.     On March 20, 2009, Raginta (on behalf of Akista) agreed to lend $1.05 million to Regional Waters (the "Regional Waters March 09 Loan").  Attached hereto as **Exhibit 19** is a true and correct copy of the Regional Waters March 09 Loan.  The Regional Waters March 09 Loan is a 2-page document and is virtually identical to the loan agreements described above and is devoid of security. Like the other loans, it has no commercial purpose.

74.     On June 4, 2009, Raginta (on behalf of Akista) agreed to lend $2,318,000 to Regional Waters (the "Regional Waters June 09 Loan").  Attached hereto as **Exhibit 20** is a true and correct copy of the Regional Waters June 09 Loan.  The Regional Waters June 09 Loan is a 2-page document and is virtually identical to the loan agreements described above and is devoid of security. Like the other loans, it has no commercial purpose.  The Regional Waters June 09 Loan was increased to $3.7 million on December 1, 2009 and to $7.7 million on June 1, 2011 by subsequent amendments.  Attached hereto as **Exhibit 21** are true and correct copies of the amendments.

75.     On March 24, 2010, Raginta (on behalf of Akista) agreed to lend $8 million to Regional Waters (the "Regional Waters March 10 Loan").  Attached hereto as **Exhibit 22** is a true and correct copy of the Regional Waters March 10 Loan.  The Regional Waters March 10 Loan is a 2-page document and is virtually identical to the loan agreements described above and is devoid of security. Like the other loans, it has no commercial purpose.

76.     The total amount loaned to Regional Waters under the above loan agreements was $17,950,000 million.  The Joint Trustees' investigation reveals that Raginta transferred to Regional Waters at least $16,793,866 under these loan agreements.

77. In each of the Regional Waters loan agreements discussed above, Regional Waters identifies JPM as the correspondent bank for U.S. dollar denominated transactions. For JPM's headquarters, *see* paragraph 60, above.

78. The Joint Trustees seek records of the dollar denominated transactions associated with the Regional Waters loan, as detailed more fully in the subpoena to JPM attached to the Application.

### Calbex Management Limited ("Calbex")

79. Calbex was a BVI company which received a $5 million loan from Raginta on June 26, 2009 (the "Raginta-Calbex Loan"). Attached hereto as **Exhibit 23** is a true and correct copy of the Raginta-Calbex Loan agreement.  The Raginta-Calbex Loan agreement is a 2-page document and is virtually identical to the loan agreements described above and is devoid of security. Like the other loans, it has no commercial purpose.  Furthermore, the Raginta-Calbex Loan agreement was executed by Andry Tryfonos on Calbex's behalf.  Ms. Tryfonos was a director of Signfays Solutions Limited, one of the most active Motylev Disclosed Companies.

80. The Joint Trustees' investigation reveals that Raginta transferred to Calbex at least $2,212,154 under the Raginta-Calbex Loan.

81. No correspondent bank is specified in the Raginta-Calbex Loan agreement. However, the documents identify Hellenic Bank as Calbex's bank for the transaction.  Based on the Joint Trustees' research, Hellenic Bank uses Citibank, JPM, and Bank of New York as its correspondent banks for transactions denominated in U.S. dollars.  *See* List of Correspondent Banks, https://www.hellenicbank.com/portalserver/content/atom/ba122ca0-b615-4054-878e-

cf272e6e3254/content/PDF/NOSTRO/NOSTRO%20FINAL5.pdf?id=3ab8fe6c-4b62-47d3-aaf9-47ecae623305.  For headquarters of these banks, *see* paragraph 60.

82.    The Joint Trustees seek records of the dollar denominated transactions associated with the Raginta-Calbex Loan, as detailed more fully in the subpoenas to Citibank, JPM and Bank of New York attached to the Application.

**Enno Investments Limited ("Enno")**

83.    Enno Investments Limited ("Enno") is a company incorporated in Belize that received a $24 million loan from Rakola Assets Limited ("Rakola"), a Motylev Disclosed Company on February 18, 2015 (the Rakola-Enno Loan"). Attached hereto as **Exhibit 24** is a true and correct copy of the Rakola-Enno Loan agreement.  The Rakola-Enno Loan agreement is a 2-page document devoid of security and has no commercial purpose. This loan was increased to $27 million by a supplemental agreement, dated April 28, 2015. Attached hereto as **Exhibit 25** is a true and correct copy of the one-page amendment.

84.    The Joint Trustees do not have banking records showing movement of funds for this transaction, but the Joint Trustees have uncovered other information which suggests that Enno received $26,518,000 under the Rakola-Enno Loan between March 24, 2015 and May 14, 2015.

85.    The Rakola-Enno Loan documents identify DBTCA as the correspondent bank for payments denominated in US dollars. DBTCA's headquarters are set forth in paragraph 49, above.

86.    The Joint Trustees seek records of the dollar denominated transactions associated with the Rakola-Enno Loan, as detailed more fully in the subpoena to DBTCA attached to the Application.

**Ramanda Investments Inc. ("Ramanda")**

87.     Ramanda is a company incorporated in Panama. Ramanda received a significant loan from Aliqua Services Limited ("Aliqua"), a Motylev Disclosed Company incorporated in BVI (the "Aliqua-Ramanda Loan").

88.     The original Aliqua-Ramanda Loan agreement is not in the Joint Trustees' possession.  However, the amendments to the loan that are in the Joint Trustees' possession state that Aliqua entered into a loan agreement with Ramanda on June 19, 2012.  Attached hereto as **Exhibit 26** are true and correct copies of the amendments.  Through these amendments, the original principal under this loan agreement was increased to $20 million. The Joint Trustees have been unable to identify a commercial purpose for the Aliqua-Ramanda Loan through their investigation.

89.     The Joint Trustees do not have banking records showing movement of funds for this transaction, but the Joint Trustees have uncovered other information which suggests that Ramanda received $12,175,404 under the Aliqua-Ramanda Loan between August 7, 2012 and July 8, 2015.

90.     The Aliqua-Ramanda Loan documents identify Bank of New York as the correspondent bank for payments denominated in US dollars.  For Bank of New York's headquarters, see paragraph 60, above.

91.     The Joint Trustees seek records of the dollar denominated transactions associated with the Aliqua-Ramanda Loan, as detailed more fully in the subpoena to Bank of New York attached to the Application.

**Wilfor Limited ("Wilfor")**

92.     Wilfor is a company incorporated in Belize which received two significant

loans from Gaylen Management Limited, a Motylev Disclosed Company registered in BVI ("Gaylen").

93.     Under two separate loan agreements dated July 5, 2013 and October 7, 2013, Gaylen agreed to lend Wilfor $13 million and $15 million, respectively, for a total of $28 million (the "Gaylen-Wilfor Loans").  Attached hereto as **Exhibit 27** are true and correct copies of the Gaylen-Wilfor Loans.  The Gaylen-Wilfor Loans are 4-page documents, 1 page of which has only signature and bank account information.  The Gaylen-Wilfor Loans are devoid of security and have no discernable commercial purpose.  Furthermore, Wilfor's registered address in Belize—Suite 102 Ground Floor, Blake Building, Cornery Eyre & Hutson Streets, Belize City, Belize—is associated with other Motylev-related companies.

94.     The Joint Trustees do not have banking records showing movement of funds for this transaction, but the Joint Trustees have uncovered other information which suggests that the entirety of the $28 million loan was transferred to Wilfor's bank account between July 15, 2013 and December 11, 2013.

95.     The Gaylen-Wilfor Loan documents identify DBTCA as the correspondent bank for payments denominated in US dollars.  DBTCA's headquarters are set forth in paragraph 49, above.

96.     The Joint Trustees seek records of the dollar denominated transactions associated with the Gaylen-Wilfor Loans, as detailed more fully in the subpoena to DBTCA attached to the Application.

### Edmon Capital Ltd ("Edmon")

97.     Edmon was a Belize company which received two significant loans from Starwine Investments Limited ("Starwine"), a Motylev Disclosed Company registered in

BVI.  On July 4, 2013 and October 7, 2013, Starwine agreed to lend Edmon $12 million and

$15 million, respectively, for a total of $27 million (the "Starwine-Edmon Loans").

Attached hereto as **Exhibit 28** are true and correct copies of the Starwine-Edmon Loans.

The Starwine-Edmon Loans have no commercial purpose.

98.     The Joint Trustees do not have banking records showing movement of funds

for this transaction, but the Joint Trustees have uncovered other information which suggests

that the entirety of the $27 million loan was transferred to Edmon's bank account between

July 15, 2013 and December 11, 2013.

99.     The agreements covering the Starwine-Edmon Loans are virtually identical to

those covering the Gaylen-Wilfor Loans.  Furthermore, Edmon's registered address in

Belize is the same as Wilfor's.  As such, and based on the dates and amounts of the

transactions, the Joint Trustee's believe that the Starwine-Edmon Loans and the Gaylen-

Wilfor Loans are related.

100.    The loan documents identify DBTCA as the correspondent bank for

payments denominated in US dollars.  DBTCA's headquarters are set forth in paragraph 49,

above.

101.    The Joint Trustees seek records of the dollar denominated transactions

associated with the Starwine-Edmon Loans, as detailed more fully in the subpoena to

DBTCA attached to the Application.

**Longford Development Inc ("Longford")**

102.    Longford was a BVI company which received a loan of $3.6 million from

Gaylen on July 5, 2013 ("Gaylen-Longford Loan").  Attached hereto as **Exhibit 29** is a true

and correct copy of the Gaylen-Longford Loan agreement.  The Gaylen-Longford Loan

agreement is virtually identical to, and is dated the same as, the first Gaylen-Wilfor Loan agreement.

103.   The Joint Trustees do not have banking records showing movement of funds for this transaction, but the Joint Trustees have uncovered other information which suggests that Longford received the entirety of the $3.6 million loan from Gaylen to its HSBC Private Bank (Suisse) account.

104.   The Gaylen-Longford Loan agreement identifies HSBC as the correspondent bank for payments denominated in US dollars.  HSBC's headquarters are set forth in paragraph 60, above.

105.   The Joint Trustees seek records of the dollar denominated transactions associated with the Gaylen-Longford Loan, as detailed more fully in the subpoena to HSBC attached to the Application.

**Excella Business Investment Limited ("Excella")**

106.   Excella was a BVI company which entered into an agreement with Gaylen on August 19, 2013, under which Excella was to sell Gaylen nine promissory notes for $70 million (the "Excella-Gaylen Sale").  Attached hereto as **Exhibit 30** is a true and correct copy of the Excella-Gaylen Sale agreement.

107.   The Joint Trustees do not have banking records showing movement of funds for this transaction, but the Joint Trustees have uncovered other information which suggests that Gaylen paid $58 million to Excella's PPF Banka account under the Excella-Gaylen Sale.  The Joint Trustees have identified no evidence that the promissory notes were ever redeemed or that they were even real.

108.   No correspondent bank for Excella is specified in the Excella-Gaylen Sale

agreement.  However, the documents do identify PPF Banka as Excella's bank for the transaction.  Based on the Joint Trustees' research, PPF Banka uses Bank of New York as its correspondent banks for transactions denominated in U.S. dollars.  *See* PPF Banka List of Correspondent Banks,  https://www.ppfbanka.cz/en/document/download/6660.  For Bank of New York's headquarters, see paragraph 60 above.

109.    The Joint Trustees seek records of the dollar denominated transactions associated with the Excella-Gaylen Sale, as detailed more fully in the subpoena to Bank of New York attached to the Application.

### Barten Capital LLP ("Barten")

110.    Barten is a limited liability partnership registered in England and Wales which received a significant loan from Virna Limited ("Virna"), a Motylev Disclosed Company registered in BVI.

111.    On January 11, 2013, Virna agreed to lend Barten $4 million (the "Virna-Barten Loan").  Attached hereto as **Exhibit 31** is a true and correct copy of the Virna-Barten Loan.  The Virna-Barten Loan has no commercial purpose and is a 5-page document similar to the Starwine-Edmon Loans and Gaylen-Wilfor Loans.

112.    The Joint Trustees do not have banking records showing movement of funds for this transaction, but the Joint Trustees have uncovered other information which suggests that $2 million was transferred to Barten on January 15, 2013 under the Virna-Barten Loan.

113.    The Virna-Barten Loan documents identify Commerzbank AG and JPM as the correspondent banks for payments denominated in US dollars. For Commerzbank's and JPM's headquarters, see paragraphs 55 and 60 above.

114.    The Joint Trustees seek records of the dollar denominated transactions

associated with the Virna-Barten Loan, as detailed more fully in the subpoenas to

Commerzbank and JPM attached to the Application.

### Broadlands Finance Ltd. ("Broadlands")

115.    Broadlands was incorporated in BVI, and was, at one point, a shareholder of

Walney Investments Limited ("Walney"), a Cyrpriot Motylev Disclosed Company.

Attached hereto at **Exhibit 32** is a true and correct copy of the Walney Shareholder Register.

116.    Broadlands entered into various loan agreements with Walney.  Between

June 9, 2009 and February 10, 2011, Walney agreed to lend Broadlands $10,300,000 (the

"Walney-Broadland Loans").  Attached hereto as **Exhibit 33** are true and correct copies of

the Walney-Broadland Loans.  The Joint Trustees believe that there is no commercial

purpose for these loans and they were part of Motylev's sham transactions.

117.    No correspondent bank is specified in the Walney-Broadland Loan

agreements.  However, the documents do identify Bank of Cyprus as Broadland's bank for

the transaction.  Based on the Joint Trustees' research, Bank of Cyprus uses Citibank, JPM,

Bank of New York, and HSBC as its correspondent banks for transactions denominated in

U.S. dollars.  Attached hereto as **Exhibit 34** is List of Correspondent Banks for Bank of

Cyprus, available on its website at

https://www.bankofcyprus.com.cy/globalassets/cyprus/main-coresp-banks/list-of-main-

correspondents.pdf.) For headquarters of these bank, see paragraph 60 above.

118.    The Joint Trustees seek records of the dollar denominated transactions

associated with the Walney-Broadland Loan, as detailed more fully in the subpoenas to

Citibank, JPM, Bank of New York, and HSBC attached to the Application.

**Renestone Holdings Ltd ("Renestone")**

119.    Renestone was a BVI company which, at one point, was a shareholder of Marsford Company Limited ("Marsford"), a Motylev Disclosed Company. Between June 9, 2009 and February 8, 2011, Marsford agreed to lend Renestone $8,850,000 (the "Marsford-Renestone Loans").  Attached hereto as **Exhibit 35** are true and correct copies of the Marsford-Renestone Loans.

120.    The Marsford-Renestone Loan agreements are virtually identical to the Walney-Broadland Loan agreements.  As such, and based on the virtually identical dates of the three loans, the Joint Trustees believe that the Marsford-Renestone Loans and the Walney-Broadland Loans are related.  As with the Walney-Broadland Loans, the Joint Trustees believe that there is no commercial purpose for the Marsford-Renestone Loans and that they were part of Motylev's sham transactions.

121.    No correspondent bank is specified in the Marsford-Renestone Loan agreements.  However, the documents do identify Bank of Cyprus as Broadland's bank for the transaction.  For Bank of Cyprus's correspondent banks for transactions denominated in U.S. dollars and their headquarters, see paragraphs 60 and 117, above.

122.    The Joint Trustees seek records of the dollar denominated transactions associated with the Marsford-Renestone Loan, as detailed more fully in the subpoenas to Citibank, JPM, Bank of New York, and HSBC attached to the Application.

**Megainvest Overseas Limited ("Megainvest")**

123.    In 2014, Mr. Motylev entered into an agreement with Megainvest to purchase OOO "RESO Pension Investments" ("**RESO**"), a Russian pension fund for $107,616,334 (the "**Reso Sale and Purchase Agreement**").  The Joint Trustees do not suggest that

27

Motylev controls Megainvest. This purchase was based on a valuation of RESO for just over 40% of the value of the fund's assets. This contrasted to the market price at the time which the Joint Trustees believe was around 10 – 15% of assets as well as Motylev's own admission in an interview that the pensions market was experiencing unusual turbulence due to legislative changes.  Attached hereto as **Exhibit 36** is a true and correct copy and translation of the November 2014 Kommersant article describing the transaction.

124.    Therefore, it appears that the consideration paid for RESO was a significant overpayment compared to the market value of the pension fund. The Joint Trustees' investigation has further established that Mr. Motylev himself paid a significant portion of the sale price, deriving the relevant funds from RCB through a complicated series of transactions. Attached hereto as **Exhibit 37** are documents the Joint Trustees obtained from Credit Suisse, Mr. Motylev's bank for the transaction, that include the RESO Sale and Purchase Agreement and instructions to the bank for the transfer.

125.    The Joint Trustees believe that the overpayment was designed to be held for the benefit of Mr. Motylev and to put assets beyond the reach of creditors.

126.    The Credit Suisse documents identify Bank of New York as the U.S. dollar correspondent bank for this transaction. *See* Ex. 37. For Bank of New York headquarters, please see paragraph 60, above.

127.    The Joint Trustees seek records of the dollar denominated transactions associated with the RESO Sale and Purchase Agreement, as detailed more fully in the subpoena to Bank of New York attached to the Application.

**R.F Found Ltd ("RF Found"), D.G.R.F. ("DGRF"), R.F. ("RF")**

128.    RF Found, DGRF and RF came to the Joint Trustees' attention through the

Expobank statements of Rorfin Holdings Limited ("Rorfin"), a Motylev Disclosed

Company.  Attached hereto as **Exhibit 38** is a true and correct copy of the Expobank

statements ("Rorfin Statements").  On June 14, 2010 Rorfin received a loan of $30 million

from Degroof Banque Privée SA ("Degroof").  Attached hereto as **Exhibit 39** is a true and

correct copy of the Degroof-Rorfin loan agreement. The Joint Trustees requested

information from ODDO BHF, the successor bank to Landolt & Cie SA, which is in turn the

successor bank to Degroof concerning the Degroof-Rorfin loan.  In response, ODDO BHF

provided the following: (a) Rorfin was unknown to the bank; and (b) Degroof was deleted

from the commercial register on July 3, 2013, and therefore did not conduct business as

Degroof after that date.  Given that Rorfin received documents with Degroof letterhead in

2014 and 2015 and that ODDO BHF has no record of a loan to Rorfin, the Joint Trustees

suspect that the Degroof-Rorfin loan and any subsequent correspondence between Rorfin

and Degroof were forgeries.

129.    Further supporting the Joint Trustees' suspicion is that Rorfin made payments

under this loan to three different entities: (a) $2,254,752 to RF Found, a Bahamas company,

(b) $2,452,500 to DGRF, of unknown jurisdiction, and (c) $1,442,752 to RF, also of

unknown jurisdiction, all to accounts held with Bank Arner SA.  None of these accounts is

associated with Degroof or any of its successor banks. The Joint Trustees believe that these

transfers against a backdrop of forgery and fraud reflects a clear attempt by Mr. Motylev to

put his assets beyond the reach of creditors.

130.    One Swiss Bank, the successor to Bank Arner, uses Bank of New York as the

correspondent bank for U.S. dollar denominated transactions.  Attached hereto as **Exhibit

40** is List of Correspondent Banks for One Swiss Bank, available on its website at

https://oneswissbank.com/wp-content/uploads/2019/07/Standard-Correspondent-Banks.pdf.)

For Bank of New York's headquarters, see paragraph 60, above.

<u>Conclusion</u>

131.    The Joint Trustees intend to use the information sought by this Application to trace the funds misappropriated by Mr. Motylev and his associates and to bring claims in the English Bankruptcy Proceeding to recover those assets wherever they may be found, in accordance with the Joint Trustees' court-ordered obligations under the November 2, 2020 Order in the English Bankruptcy Proceeding.

Date: December 23, 2021

_____
Kevin Hellard