**EXHIBIT 37**

**CREDIT SUISSE**

CREDIT SUISSE AG
CH-8070 Zürich

Phone     +41 44 333 44 44
www.credit-suisse.com
BIC        CRESCHZZ80A

Private Banking

| | |
|---|---|
| **IBAN** | **CH43 0483 5134 0436 3200 3** |
| Account | Current account 1340436-32-3 |
| In the name of | Anatoly Motylev, RET |
| Currency | USD |
| | |
| Your advisor | Ms Elena Klassova |
| Phone | +41 44 644 29 60 |
| | |
| Your reference | RESO Pension Investments |
| | Purchase |

Mr
Anatoly Motylev
RET
SHS  TSBK 111





# Debit advice

24.11.2014
Page 1/1

| Text | Value | Currency | Amount |
|---|---|---|---|
| As per order dated 21.11.2014 | | USD | 107'616'313.00 |
| Our charges | | USD | 20.78 |
| **Total** | **24.11.14** | **USD** | **107'616'333.78** |

| | |
|---|---|
| In favor of | Megainvest Overseas Limited |
| | Geneva Place |
| | Waterfront Drive P.O. Box 3469 |
| | Virgin Islands (Brit) |
| | |
| Payment reason | RESO Pension Investments Purchase |

ZV03

---

Form without signature                    VAT no: CHE-116.285.487 MWST                    Transaction No. SIRR 81 3F80-1121-80-891-0000
RET

01.12.14

Company Name: Megainvest Overseas Limited
Company address: Geneva Place, Waterfront Drive, P.O. Box 3469, Road Town, Tortola, British Virgin Islands
Bank name: Credit Suisse
SWIFT: CRESCHZZ80A
IBAN USD: CH35 0483 5121 1991 6200 1
Bank correspondent: Bank of New York
SWIFT: IRVTUS3NXXX
One Wall Street US-New York
Corr. Account: 8033342099

CSG-DC : 06
BU-Code : 0012
BKST : 0835
Instr. : SIRR 81

0835-1340436-3

107 616 313

Please transfer from my private account sum of 107 613 313 USD in favor of Megainvest Overseas Limited

21. 11. 2014

Расчеты по сделке по приобретению НПФ

| Сумма | Валюта | Дата платежа | Банк получателя | Получатель | Плательщик | Эквивалент/курс | Пункт договора (примечания) | |
|---|---|---|---|---|---|---|---|---|
| 1 121 392 976 | рубли | 18 ноября | РЕСО-Банк | Ресо Пенсионные инвестиции | ООО ЕвроСтрой | 23 691 617 (47,3329) | Платеж по Договору займа, п.3.2.1 Договора к-п 100% долей РЕСО ПИ | Оплачено 1.121'400 .000 руб. |
| 783 020 000 | рубли | 19 ноября | Expobank (Рига) | Forzelius | Компания АДАМСВУД ХОЛДИНГС ЛТД (Кипр), Компания ЛОКУСЛЭНД ХОЛДИНГ ЛТД (Кипр), Компания РОЗОФОРОД ИНВЕСТМЕНТС ЛТД (Кипр) | 16 667 198 (46,9797) | Платеж по нотариальному договору за акции "РЕСО ПИ" (платеж оформлен Соглашением об авансовом платеже), п.3.3 Договора к-п 100% долей РЕСО ПИ | Оплачено. |
| 107 616 313 в т.ч. | доллары США | 24-25 ноября | Кредит Свисс | Megainvest | Мотылев А.Л. | | Основной платеж + 50% отложенного платежа. Курс закреплен в договоре. В декабре отложенный платеж переводится на счет Эскроу. П 3.7.3 Договора к-п 100% долей РЕСО ПИ | |
| 87 085 113 | | | | | | | Цена фонда | |
| 20 531 200 | | | | | | | 50% отложенного платежа, поступающая Продавцу и впоследствии, переводимая им на счет Эскроу, п.4.2 Договора к-у 100% долей РЕСО ПИ | |
| 20 531 200 | доллары США | до 31 декабря 2014 | Кредит Свисс | Эскроу счет | Мотылев А.Л. | | Вторая половина (50%) отложенного платежа, идущая на счет Эскроу, п.4.4 Договора к-п 100% долей РЕСО ПИ | |

**ИТОГО выплаты:**
В рублях:            1 904 412 976
В долларах:        128 147 513

Общие выплаты в
долларовм            168 506 328
эквиваленте

EXECUTION COPY

**MEGAINVEST OVERSEAS LIMITED**

**AND**

**ANATOLY LEONIDOVICH MOTYLEV**

---

**AMENDED AND RESTATED AGREEMENT RELATING
TO THE SALE AND PURCHASE OF A 100%
PARTICIPATION INTEREST IN OOO "RESO -
PENSION INVESTMENTS"**

---

**THIS AGREEMENT** is executed as a deed on 17 November 2014

**BETWEEN:**

(1)     **MEGAINVEST OVERSEAS LIMITED**, a company incorporated in the British Virgin Islands (registered number 1029993), whose registered office is at Geneva Place, Waterfront Drive, P.O. Box 3469, Road Town, Tortola, British Virgin Islands, represented by attorney-in-fact Andrey Nickolaevich Saveliev, national of the Russian Federation, born on 28 June 1973 in Kharkov (USSR), passport series 45 06 number 410578 issued by OVD "Fili-Davydkovo" of the City of Moscow on 4 September 2003, subdivision code 772-035, registered at Leninsky Prospect 98, bld. 1, apt. 29, Moscow 119415, Russia acting under the power of attorney issued on 30 October 2014 (the "**Seller**"); and

(2)     **ANATOLY LEONIDOVICH MOTYLEV**, national of the Russian Federation, born on 11 August 1966 in Moscow, passport series 4511 number 352848 issued by UFMS of Khamovniki region of the City of Moscow on 06 September 2011, subdivision code 770-011, registered on the date hereof at apt. 154, 5 Rostovskaya Naberezhnaya, Moscow, Russia (the "**Buyer**").

(the above persons are hereinafter individually referred to as a "**Party**" and collectively as the "**Parties**".)

**WHEREAS:**

(a)     The Buyer wishes to acquire control over Closed Joint Stock Company "Non-state Pension Fund Savings Fund RESO", a non-public joint stock company incorporated in the Russian Federation under main registration number (OGRN) 1147799010985, taxpayer identification number (INN) 7726486062, whose registered office is at Nagorny Proezd 6, bld. 6, Moscow 117105, Russia (the "**Fund**").

(b)     As of the date hereof:

(1)     the charter capital of the Fund consists of two hundred million (200,000,000) roubles divided into two hundred million (200,000,000) registered ordinary shares with a nominal value of one (1) rouble per share, of which one hundred forty nine million six hundred fifty seven thousand two hundred fifty one (149,657,251) registered ordinary shares have been issued (the "**Fund's Issued Shares**").

(2)     all Fund's Issued Shares are owned by OOO "RESO Pension Investments", a limited liability company incorporated in the Russian Federation under main registration number (OGRN) 1037739694904, taxpayer identification number (INN) 7716130878, whose registered office is at Nagorny Proezd, bld. 8, Moscow 117105, Russia (the "**Company**").

(3)     99.999% of the shares in the charter capital of the Company are owned by Forzelius Investment Limited, a limited liability company incorporated in Cyprus (registered number HE 330616), whose registered office is at 28 Oktovriou & Eleftheriou Venizelou, 277 Eden Beach Apartments, block 1, Flat/Office 502, Limassol CY-3035, Cyprus ("**Forzelius**") and 0.001% of the shares in the charter capital of the Company are owned by Andrey Nickolaevich Saveliev, national of the Russian Federation, born on 28 June 1973 in Kharkov (USSR), passport series 45 06 number 410578 issued by OVD "Fili-Davydkovo" of the City of Moscow on 4 September 2003, subdivision code 772-035, registered at Leninsky Prospect 98, bld. 1, apt. 29, Moscow 119415, Russia ("**Mr. Saveliev**").

(4)     the Company has debt in the form of promissory notes issued by the Company to OOO "Holding Company RESO Capital", a limited liability company incorporated in the

Russian Federation under main registration number (OGRN) 5077746931818, taxpayer identification number (INN) 7710678467, whose registered office is at Gasheka Street 12, bld 1, Moscow, 125047, Russia in the total principal amount of RUR 1 019 747 661 (the "**Debt**"). As of 18 November 2014 interest accrued on the Debt in accordance with the terms of the promissory notes amounts to RUR 98 433 520 and 61 kopeks.

(c)     The Seller is able to exercise control over Forzelius so that to direct Forzelius and its Affiliates to enter into transactions described herein.

(d)     The Parties agree to structure the acquisition of control over the Fund by means of a purchase of one hundred percent (100%) of shares in the Company (the "**Sale Shares**") by the Buyer and certain nominees acting for the Buyer and the refinancing of the Debt and accrued interest thereon, on the terms and subject to the conditions set forth herein (jointly, the "**Transaction**").

(e)     On 5 November 2014 the Parties entered into the Agreement relating to the sale and purchase of a 100% participation interest in OOO "RESO – Pension Investments" (the "**Original Agreement**").

(f)     The Parties now wish to amend and restate the Original Agreement so that the Original Agreement is replaced in its entirety by this Agreement. This Agreement is an amendment to the Original Agreement.


**THE PARTIES AGREE** as follows:

1.     **INTERPRETATION**

1.1     In this Agreement:

"**Affiliate**" means with respect to any person, any other person controlling, controlled by or under common control with such person;

"**Agreement**" means the Original Agreement as amended and restated by this agreement, as it may be further amended from time to time;

"**Avrora**" means OOO "Avrora Capital Management", a limited liability company incorporated in the Russian Federation under main registration number (OGRN) 1107746993551, taxpayer identification number (INN) 7702748142, whose registered office is at Vorobievskoe Highway, 6, of. 4, Moscow 119285, Russia, which acts as the main asset trust manager for the Fund;

"**Avrora's Share of 2014 Investment Income**" means the investment management fee due to Avrora from the Fund as of 31 October 2014 in accordance with the terms of the Asset Trust Management Agreement No. 1/12 dated 12 April 2012, which is equal to RUR 94 133 866 (ninety four million one hundred thirty three thousand eight hundred sixty six Roubles);

"**Business Day**" means a day other than a Saturday or Sunday or public holiday where banks are open for general payments business in Moscow (Russia), Riga (Latvia) and Zurich (Switzerland);

"**Claim**" means any claim made in connection with the breach by a Party of any representations and warranties set out in Clause 7 or of any indemnities set out in Clause 10;

**"Company"** has the meaning given in Recital (b);

**"Competition Limitation Event"** means 31 December 2015, provided that on or before such date each of the following conditions have been met:

(a)    the Fund has not become a member of the Pension Savings Guarantee System or has otherwise not qualified to receive 2013 Pension Assets or has been expelled from the Pension Savings Guarantee System; and

(b)    as of 31 December 2015 there are less than three Eligible Pension Funds which are members of the Pension Savings Guarantee System or are otherwise qualified to receive 2013 Pension Assets;

**"Completion"** means the signing of the Notarial Deed in front of a notary public;

**"Completion Date"** means the date of signing of the Notarial Deed in front of the notary public;

**"Constitutional Documents"** means, in relation to any Person, the certificate of incorporation or the charter, the certificate of registration and other constitutional documents of such Person;

**"Debt"** has the meaning given in Recital (b);

**"Deferred Amount"** means, save as adjusted in accordance with Clauses 6.1 and 6.2, the amount in US Dollars determined on the basis of the occurrence of earliest of the following events:

(a)    in the event that any of the following occurs:

        (i)    the Transfer Event;

        (ii)    the Fund Non-acceptance Event; or

        (iii)    the Fund Expulsion Event

        USD 41 062 400 (forty one million sixty two thousand four hundred US Dollars);

(b)    in the event that any of the following occurs:

        (i)    the Nationalisation Event;

        (ii)    the Non-Transfer to Eligible Funds Event; or

        (iii)    the Competition Limitation Event;

        nil; and

(c)    in the event that the Transfer with a Reinvestment Condition Event occurs, the sum in US Dollars of (1) USD 41 062 400 (forty one million sixty two thousand four hundred US Dollars) multiplied by the Mandatory Reinvestment Proportion and multiplied by 75%, plus (2) USD 41 062 400 (forty one million sixty two thousand four hundred US Dollars) multiplied by the difference between 100% and the Mandatory Reinvestment Proportion;

**"Deferred Amount Advance"** means the amount in US Dollars of USD 20 531 200 (twenty million five hundred thirty one thousand two hundred US Dollars);

**"Dispute"** has the meaning given in Clause 21.1;

**"Eligible Pension Fund"** means any non-state pension fund licensed in the Russian Federation other than funds listed in Annex 1;

**"Encumbrance"** means any pledge, mortgage, transfer into trust, security, third party right, claim, security interest, voting agreement, option, first offer right, obligation or any other restriction of such nature, including, but not limited to, any Encumbrance which may arise pursuant to any written arrangement or agreement;

**"Escrow Account"** means a current account denominated in US Dollars, opened in the name of the Escrow Agent with the Escrow Bank;

**"Escrow Agent"** means Credit Suisse Solution Partners AG, a company incorporated in Switzerland, with registered number CHE-109.855.132 and having its registered address at Gartenstrasse 14, 8002 Zurich, Switzerland;

**"Escrow Agreement"** means the agreement between the Buyer, the Seller and the Escrow Agent with respect to the Escrow Account reflecting the arrangements set out in Clauses 4.7 and 4.8;

**"Escrow Bank"** means Credit Suisse AG, Paradeplatz 8, 8070 Zurich, Switzerland;

**"Execution Date"** means 5 November 2014;

**"Federal Act"** means any federal law, government decree, presidential edict, regulation by the Central Bank of Russia or any other laws or regulations, the compliance with which is mandatory for non-state pension funds in Russia;

**"Forzelius"** has the meaning given in Recital (b);

**"Fund"** has the meaning given in Recital (a);

**"Fund Expulsion Event"** means 31 December 2015 provided that on or before such date the Fund has been expelled from the Pension Savings Guarantee System or such other event or circumstance has occurred which makes the Fund ineligible to receive 2013 Pension Assets, provided that on 31 December 2015 at least three Eligible Pension Funds remain members of the Pension Savings Guarantee System or are otherwise qualified to receive 2013 Pension Assets;

**"Fund Non-Acceptance Event"** means 31 December 2015, provided that on or before such date each of the following conditions have been met:

(a)     the Fund has not become a member of the Pension Savings Guarantee System or has otherwise not qualified to receive 2013 Pension Assets; and

(b)     any three Eligible Pension Funds have become members of the Pension Savings Guarantee System or have otherwise qualified to receive 2013 Pension Assets;

**"Fund's Issued Shares"** has the meaning given in Recital (b);

**"Governmental Authority"** means (i) any supranational organisation or any regional or political subdivision of such organisation; (ii) any person, entity or authority exercising

5

executive, legislative, judicial, supervisory or administrative functions on behalf of a supranational organisation or any regional or political subdivision of such organisation, including, but not limited to, any supranational institutions, instrumentalities, ministries, agencies, departments, boards, commissions, authorities and subdivisions of such organization; (iii) any court of law, arbitration tribunal or commercial court and (iv) any self-regulatory organization conducting its activity on behalf of any state or in its own name to the extent of the authorities granted to such organization by applicable law;

"**Initial Amount**" means the amount in US Dollars equal to USD 127 443 928 (one hundred twenty seven million four hundred forty three thousand nine hundred twenty eight US Dollars).

"**Seller's Initial Consideration**" means the amount in US Dollars equal to:

(a)     the Initial Amount; less

(b)     the equivalent in US Dollars of the Local Consideration at the official exchange rate of the Central Bank of the Russian Federation as of the date on which the Local Consideration was paid into the bank account of Forzelius; less

(c)     the equivalent in US Dollars of the principal amount of the Debt and accrued interest thereon up to the date on which the Refinancing Loan was paid into the bank account of the Company, calculated in US Dollars at the official exchange rate of the Central Bank of the Russian Federation as at the date on which the Refinancing Loan was paid into the bank account of the Company;

"**Joint Release Instruction**" means the joint instruction from the Buyer and the Seller to pay out the funds held in the Escrow Account to either the Buyer or the Seller (or to both in a certain proportion), in form and substance satisfactory to the Escrow Agent;

"**Law**" or "**Legislation**" means any applicable (i) provisions of all constitutions, agreements, statutes, laws, recognised customary practice, codes, rules, decrees, directives or orders of any Governmental Authority, (ii) any permission of the Governmental Authority and (iii) orders, decisions, prohibitions, judicial opinions, resolutions and decrees of any Governmental Authority;

"**Local Consideration**" has the meaning set out in Clause 3.7;

"**Loan Agreement**" means the loan agreement between the New Lender and the Company with respect to the Refinancing Loan, in the agreed form;

"**Losses**" means all losses, liabilities, costs (including, reasonable legal costs and experts' and consultants' fees), charges, expenses, actions, proceedings, claims and demands, but excluding loss of profits and consequential loss;

"**Mandatory Reinvestment Proportion**" means such share of the 2013 Pension Assets that non-state pension funds are required to invest in certain assets designated by a Federal Act as a condition of receiving such 2013 Pension Assets from the State Pension Fund, as set out in a Federal Act;

"**Mr Saveliev**" has the meaning given in Recital (b);

"**Nationalisation Event**" means the entry into force of a Federal Act pursuant to which 2013 Pension Assets are nationalised or otherwise irrevocably declared as non-transferrable from the State Pension Fund to non-state pension funds;

"**New Asset Manager**" means Closed joint stock company "Interfin Capital", incorporated in the Russian Federation, taxpayer identification number (INN) 7702158961, whose registered office is at 14 Bakuninskaya Street, bld 13, Moscow 105005, Russia;

"**New Lender**" means OOO "EvroStroy", a limited liability company incorporated in the Russian Federation, taxpayer identification number (INN) 7708787902, whose registered office is at 81 Vavilova Street, of. 25, Moscow 117335, Russia;

"**Nominees**" means jointly Nominee 1, Nominee 2 and Nominee 3;

"**Nominee 1**" means Adamswood Holdings Ltd, a limited liability company incorporated in Cyprus (registered number HE 337019), having its registered address at Vasili Michailidi 9, LImassol 3026, Cyprus, 100% of shares in which are beneficially owned on the Execution Date by Konstantin Anatolievich Popov, national of the Russian Federation, born on 19 September 1968 in stanitsa Leningradskaya of Krasnodar Kray, passport series 4513 number 329888 issued by UFMS of Khamovniki region of the City of Moscow on 03 October 2013, subdivision code 770-011, registered on the Execution Date at apt. 34, 10 1st Neopalimovsky pereulok, Moscow, Russia;

"**Nominee 2**" means Locusland Holdings Ltd, a limited liability company incorporated in Cyprus (registered number HE 337283), having its registered address at Vasili Michailidi 9, LImassol 3026, Cyprus, 100% of shares in which are beneficially owned on the Execution Date by Andrey Igorevich Kulikov, national of the Russian Federation, born on 07 April 1974 in Moscow, passport series 4508 number 863004 issued by OVD Troparevo-Nikulino of the City of Moscow on 14 November 2006, subdivision code 772-039, registered on the Execution Date at apt. 725, bld 3, 15 Nikulinskaya street, Moscow, Russia;

"**Nominee 3**" means Rosoford Investments Ltd, a limited liability company incorporated in Cyprus (registered number HE 337021), having its registered address at Vasili Michailidi 9, LImassol 3026, Cyprus, 100% of shares in which are beneficially owned on the Execution Date by Sergey Lvovich Magidov, national of the Russian Federation, born on 15 September 1972 in Moscow, passport series 4504 number 549418 issued by OVD Chertanovo-Yuzhnoe of the City of Moscow on 19 April 2003, subdivision code 772-022, registered on the Execution Date at apt. 92, bld. 2, 44 Kirovogradskaya Street, Moscow, Russia;

"**Non-transfer to Eligible Funds Event**" means 31 December 2017, provided that each of the following conditions have been met:

(a)     the Fund Non-Acceptance Event and the Fund Expulsion Event have not occurred; and

(b)     on or before 31 December 2017 the Transfer Event has not occurred.

"**Notarial Deed**" means jointly the sale and purchase agreements with respect to 100% of the Sale Shares between (1) the Buyer and Mr Saveliev and (2) the Nominees and Forzelius, in the agreed form, providing for the transfer of the Sale Shares and payment of the Local Consideration;

"**Notice**" has the meaning given in Clause 20.1;

"**Pension Savings Guarantee System**" means the group of non-state pension funds which are covered by the Russian national system of guaranteeing rights of insured persons in respect of mandatory pension savings, the participation in which is a statutory condition for receipt of 2013 Pension Assets;

**"Purchase Price"** means the amount in US Dollars equal to:

(a)     the Initial Amount; plus

(b)     the Deferred Amount; less

(c)     the equivalent in US Dollars of the principal amount of the Debt and accrued interest thereon up to the date on which the Refinancing Loan was paid into the bank account of the Company, calculated in US Dollars at the official exchange rate of the Central Bank of the Russian Federation as at the date on which the Refinancing Loan was paid into the bank account of the Company;

**"Refinancing Loan"** means the loan to be provided by the New Lender to the Company in the amount equal to the principal value of the Debt and accrued interest thereon as at the date on which the Refinancing Loan was paid into the bank account of the Company;

**"Rouble"** or **"RUR"** means the lawful currency of the Russian Federation;

**"Sale Shares"** has the meaning given in Recital (d);

**"Specialized Depositary"** means OOO "Specialized Depository Company "Garant", a limited liability company incorporated in the Russian Federation under main registration number (OGRN) 1027739142463, taxpayer identification number (INN) 7714184726, whose registered office is at 6 Krasnopresnenskaya Naberezhnaya, Moscow 123100, Russia;

**"State Pension Fund"** means the Pension Fund of the Russian Federation or its successor;

**"Tax"** means any tax, duty or levy as well as any fine or penalty related thereto (in Russian – *nalogy, sbory, nalogovye shtraphy i peni*) imposed in the Russian Federation, including (without limitation) employer's mandatory contributions to national social funds;

**"Transaction Documents"** means this Agreement, the Notarial Deed, the Escrow Agreement, the Loan Agreement and any auxiliary document executed by the Parties, the Nominees, Forzelius, Mr Saveliev, the Company or the Fund in connection therewith or with the Transaction;

**"Transfer Event"** means the transfer of 2013 Pension Assets from the State Pension Fund to any three Eligible Pension Funds;

**"Transfer with a Reinvestment Condition Event"** means the transfer of 2013 Pension Assets from the State Pension Fund to any three Eligible Pension Funds on condition that they invest all or part of the funds so received in certain assets designated by a Federal Act;

**"USD"** or **"US Dollar"** means the lawful currency of the United States of America;

**"2013 Pension Assets"** means mandatory pension savings held by the State Pension Fund with respect to individuals who elected to transfer their mandatory pension savings from the State Pension Fund to non-state pension funds and with respect to whom relevant transfer instructions were filed after 1 January 2013 with the State Pension Fund (whether directly or via then existing transfer agents);

1.2     In this Agreement, a reference to:

1.2.1     **"Control"** means the actual power of any person to direct the affairs of another person in accordance with the wishes of such first person,  such power being

granted by the charter, shareholders' agreement, the resolution made by the majority members of the board of directors or under any other document or in any other manner; or the power of such person to exert decisive influence on the company in accordance with the constitutional documents or by contract or otherwise; and the term **"Controlled"** shall be construed accordingly;

1.2.2   a document in the **"agreed form"** is a reference to a document in the form approved and for the purposes of identification initialled by or on behalf of the Seller and the Buyer;

1.2.3   a **"Person"** includes a reference to any individual, firm, company, corporation, trust, foundation or other body corporate, government, state or agency of a state or any joint venture, association or partnership (whether or not having separate legal personality);

1.2.4   a person includes a reference to that person's legal personal representatives, successors and permitted assigns;

1.2.5   references to one gender include all genders; the singular shall include the plural and vice versa, unless the context requires otherwise;

1.2.6   the words **"include"** and **"including"** shall mean, accordingly, "includes, without limitation" and "including, without limitation";

1.2.7   a **"Party"** includes a reference to that party's successors and permitted assigns;

1.2.8   a Clause, paragraph or schedule, unless the context otherwise requires, is a reference to a Clause or paragraph of, or schedule to, this Agreement; and

1.2.9   any English legal term for any action, remedy, method of judicial proceeding, legal document, legal status, court, official or any legal concept or thing shall in respect of any jurisdiction other than England and Wales be deemed to include what most nearly approximates in that jurisdiction to the English legal term and to any statute of England and Wales shall be construed so as to include equivalent or analogous laws of any other jurisdiction.

1.3   The *ejusdem generis* principle of construction shall not apply to this Agreement. Accordingly, general words shall not be given a restrictive meaning by reason of their being preceded or followed by words indicating a particular class of acts, matters or things or by examples falling within the general words. Any phrase introduced by the terms "other", "including", "include" and "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms.

1.4   The headings in this Agreement are for ease of reference and do not affect its interpretation. The definitions in the singular shall include the plural and vice versa. Unless the context requires otherwise, references to Clauses, paragraphs and schedules are references to the Clauses or paragraphs of, or schedules to, this Agreement.

1.5   Where any obligation pursuant to this Agreement is expressed to be undertaken or assumed by any Party, such obligation shall be construed as requiring the Party concerned to exercise all rights and powers of control over the affairs of any other Person which that Party is able to exercise (whether directly or indirectly) in order to secure performance of such obligation as soon as reasonably practicable..

1.6    Where any period in days is referred to in this Agreement, such period shall be calculated in calendar days unless expressly provided otherwise (and the day on which any such period is expressed to commence shall not be counted for the purpose of such period's calculation)..

1.7    Where any representation, warranty or other statement made by a Party in this Agreement is qualified by the expression "so far as the Party is aware" or "to the best of the Party's knowledge" or any similar expression, that statement shall be deemed to include an additional statement that it has been made after due and careful inquiry.

## 2.    SALE AND PURCHASE OF THE SALE SHARES

2.1    Subject to the terms of this Agreement, the Seller agrees to procure the sale and transfer by Forzelius and Mr Saveliev, and the Buyer agrees to purchase and procure the purchase by the Nominees of the Sale Shares, for the total consideration equal to the Purchase Price, free from any Encumbrances, on or before 26 November 2014.

2.2    The Buyer shall pay, and procure the payment by the Nominees, of the Purchase Price in tranches, as set out below:

    2.2.1    the Local Consideration, which shall be due and payable as set out in Clause 3.3 ;

    2.2.2    the Seller's Initial Consideration, which shall be due and payable as set out in Clause 3.7.3;

    2.2.3    the Deferred Amount Advance, which shall be due and payable as set out in Clause 3.7.3; and

    2.2.4    the Deferred Amount, which shall be due and payable as set out in Clause 4.

2.3    The Seller shall procure that the title to the Sale Shares is transferred to the Buyer and the Nominees at Completion following payment of the Local Consideration, the Seller's Initial Consideration, the Deferred Amount Advance and the Refinancing Loan.

## 3.    CONDITIONS PRECEDENT AND CLOSING MECHANICS

Entering into Transaction Documents (other than this Agreement)

3.1    On or before 18 November 2014:

    3.1.1    the Seller shall procure that the Company shall, and the Buyer shall procure that the New Lender shall, enter into the Loan Agreement;

    3.1.2    the Buyer shall procure that the New Asset Manager enters into an asset management agreement with the Fund, in the agreed form, and the relevant custody agreement with the Specialized Depositary; and

    3.1.3    the Seller shall procure that the Board of Directors of the Fund approves the asset management agreement between the New Asset Manager and the Fund.

Refinancing of the Debt

3.2    On or before 18 November 2014:

3.2.1   the Buyer shall procure that the New Lender disburses the full amount of the Refinancing Loan to the Company's account with Bank RESO Credit (Moscow); and

3.2.2   the Seller shall procure that immediately upon receipt of the proceeds of the Refinancing Loan:

(a)   the Company repays in full the principal amount of the Debt and all accrued interest thereon; and

(b)   the Fund transfers into management to the New Asset Manager the amount of cash in Roubles which is approximately equal to the amount of the Refinancing Loan.

Advance payment of the Local Consideration

3.3   On or before 20 November 2014 the Buyer shall procure that the Nominees pay to the account of Forzelius with Expobank (Riga) the amount in Roubles equal to the Local Consideration (less such amount as shall be payable directly by the Buyer to Mr Saveliev as set out in Clause 3.7.2).

3.4   The Seller shall procure that immediately upon receipt of the advance payment of the Local Consideration the Fund transfers into management to the New Asset Manager the amount of cash in Roubles which is approximately equal to the amount of the advance of the Local Consideration.

Sale by the Fund of securities issued by Affiliates of the Seller

3.5   On or before 20 November 2014 the Seller shall procure that the Fund sells for cash consideration ordinary shares of OSAO "RESO-Garantia" and bonds of OOO "RESO-Leasing", which were held by the Fund as part of its shareholders' equity, for the total consideration of not less than RUR 477 768 883 (four hundred seventy seven million seven hundred sixty eight thousand eight hundred eighty three Roubles).

Advance funding of bank accounts

3.6   Not later than 1 (one) Business Day prior to the Completion Date and in any event not later than 24 November 2014 the Buyer shall transfer to its account with Credit Suisse AG (Zurich) the amount in US Dollars equal to the sum of the Seller's Initial Consideration and the Deferred Amount Advance

Sale and transfer of the Sale Shares

3.7   On the Completion Date:

3.7.1   the Seller shall procure that Forzelius and Mr Saveliev shall, and the Buyer shall procure that the Buyer and the Nominees shall:

(a)   enter into the Notarial Deed in front of a notary public in Moscow, Russia designated by the Seller, whereby:

(i)   Nominee 1 acquires 33.333% shareholding in the Company from Forzelius for a purchase consideration of RUR 261 004 056 (two hundred sixty one million 4 thousand fifty six Roubles) and 67 kopeks;

11

(ii)    Nominee 2 acquires 33.333% shareholding in the Company from Forzelius for a purchase consideration of RUR 261 004 056 (two hundred sixty one million 4 thousand fifty six Roubles) and 67 kopeks;

(iii)    Nominee 3 acquires 33.333% shareholding in the Company from Forzelius for a purchase consideration of RUR 261 004 056 (two hundred sixty one million 4 thousand fifty six Roubles) and 67 kopeks;

(iv)    the Buyer acquires 0.001% shareholding in the Company from Mr Saveliev for a purchase consideration of RUR 7 830;

(such aggregate consideration, the **"Local Consideration"**).

(b)    perform their respective obligations under the Notarial Deed once the same is duly executed.

3.7.2    the Buyer shall pay to Mr Saveliev his share of the Local Consideration in Roubles in accordance with the Notarial Deed to the account of Mr Saveliev with Bank RESO Credit (Moscow);

3.7.3    the Buyer shall pay to the Seller's account with Credit Suisse AG (Zurich) the amount in US Dollars equal to the Seller's Initial Consideration and the Deferred Amount Advance.

Change in the Asset Management Arrangements

3.8    The Seller shall procure that from 5 November 2014 Avrora discontinues all transactions with the assets of the Fund other than disposals of assets and closing out of positions in futures for the purposes of accumulating cash. The investment portfolio (asset list) of the Fund as of closing of business on 31 October 2014 is attached hereto as Annex 2;

3.9    On the Completion Date the Seller shall procure:

3.9.1    the termination of the existing asset management agreement between the Fund and Avrora;

3.9.2    the payment by the Fund to Avrora of the Avrora's Share of the 2014 Investment Income; and

3.9.3    the delivery of written instructions from the Fund to Avrora to transfer all assets of the Fund managed by Avrora to the New Asset Manager;

3.10    From the Completion Date onwards the Seller shall procure that Avrora signs not later than 1 (one) Business Day upon receipt each document in relation to the transfer of assets of the Fund to the New Asset Manager, as may be delivered to it by the New Asset Manager upon approval by the Specialised Depositary.

4.    **DEFERRED AMOUNT; ESCROW ACCOUNT**

4.1    The Buyer shall pay the Deferred Amount to the Seller not later than 10 (ten) Business Days upon receipt of a written Notice by the Seller stating that a Transfer Event, or a Fund Non-acceptance Event, or a Fund Expulsion Event or a Transfer with a Reinvestment Condition Event has occurred, accompanied by the evidence set out in Clauses 5.2 or 5.3. In the event

that the Escrow Account is set up by the Parties as set out in this Clause 4, any payment from the Escrow Account to the Seller shall be deemed to be the payment by the Buyer to the Seller.

4.2     On the Completion Date the Buyer shall pay to the Seller the Deferred Amount Advance as advance payment of 50% of the maximum Deferred Amount. The Parties agree that this advance is an interim risk mitigation measure and should be replaced by an escrow arrangement in respect of the maximum Deferred Amount (being USD 41 062 400), as set out in Clause 4.3.

4.3     As security for the payment undertakings of the Buyer to the Seller with respect to the payment of the Deferred Amount the Parties agree to establish the Escrow Account with the Escrow Agent. The Parties agree to take all steps necessary to enter into the Escrow Agreement and open the Escrow Account on or before 15 December 2014.

4.4     Upon receipt of the confirmation from the Escrow Agent that the Escrow Account is operational the Seller and the Buyer shall transfer funds to the Escrow Account on the same day agreed upon by the Parties, being not later than 31 December 2014 (the "**Escrow Funding Date**").

4.5     At least 1 (one) Business Day prior to the Escrow Funding Date:

4.5.1     the Seller shall arrange to deposit the Deferred Amount Advance in the Seller's account with Credit Suisse AG (Zurich); and

4.5.2     the Buyer shall deposit the amount in US Dollars equal to the balance between USD 41 062 400 and the Deferred Amount Advance with the Buyer's account with Credit Suisse AG (Zurich),

and provide to the other Party and the Escrow Agent a statement from such account confirming deposit of funds.

4.6     On the Escrow Funding Date the Buyer and the Seller shall at the same time provide to Credit Suisse AG (Zurich) and the Escrow Agent bank transfer instructions to transfer the amounts referred to in Clause 4.5 above to the Escrow Account.

4.7     The terms of the Escrow Agreement shall provide that the Escrow Agent shall release the balance from the Escrow Account to the Buyer or the Seller upon receipt of either a Joint Release Instruction or a final award by the LCIA or a Notice of termination of arbitration proceedings.

4.8     Interest accrued on the Escrow Account shall be paid to the same payee together with the principal amount of the balance on the Escrow Account.

## 5.     SIGNING OF THE JOINT RELEASE INSTRUCTION

5.1     The Seller agrees to sign and furnish to the Escrow Agent the Joint Release Instruction instructing the Escrow Agent to pay out the entire balance to the credit of the Escrow Account to the Buyer not later than 10 (ten) Business Days upon receipt of a written Notice by the Buyer stating that a Nationalisation Event, or a Non-transfer to Eligible Funds Event or a Competition Limitation Event has occurred. The Notice from the Buyer shall be accompanied by the following evidence that the Parties agree to deem necessary and sufficient to prove the occurrence of the relevant event:

5.1.1   with respect to **the Nationalisation Event** – a copy of an official publication of a Federal Act, pursuant to which 2013 Pension Assets are nationalised or otherwise irrevocably declared as non-transferrable from the State Pension Fund to non-state pension funds, in *Rossiyskaya Gazeta* or such other state media which is determined by Russian law as an official publisher of Russian legislation;

5.1.2   with respect to **the Non-transfer to Eligible Funds Event** – (1) the list of non-state pension funds accepted into the Pension Savings Guarantee System as of 31 December 2017, which shall include not less than three Eligible Pension Funds, and (2) Reports on the transfer of pension savings designated for funding the savings-based work pension (in Russian – *Otchety o peredache sredstv pensionnikh nakoplenuiy, prednaznachennykh dlia financirovania nakopitelnoi chasti trudovoi pensii*) for years 2014, 2015, 2016 and 2017, which shall evidence that less than three Eligible Pension Funds (or no Eligible Pension Fund) received 2013 Pension Assets on or before 31 December 2017, as published by the Central Bank of the Russian Federation on its official website; and

5.1.3   with respect to **the Competition Limitation Event** – the list of non-state pension funds accepted into the Pension Savings Guarantee System as of 31 December 2015 which shall include less than three Eligible Pension Funds and shall not include the Fund.

5.2   The Buyer agrees to sign and furnish to the Escrow Agent the Joint Release Instruction instructing the Escrow Agent to pay out the entire balance to the credit of the Escrow Account to the Seller not later than 10 (ten) Business Days upon receipt of the written Notice by the Seller stating that a Transfer Event, or a Fund Non-acceptance Event or a Fund Expulsion Event has occurred. The Notice from the Seller shall be accompanied by the following evidence that the Parties agree to deem necessary and sufficient to prove the occurrence of the relevant event:

5.2.1   with respect to **the Transfer Event** – a copy of a press release by the State Pension Fund or the Central Bank of the Russian Federation, or press releases by at least three Eligible Pension Funds or (in absence of such press releases) a copy of a Report on the transfer of pension savings designated for funding the savings-based work pension (in Russian – *Otchet o peredache sredstv pensionnikh nakoplenuiy, prednaznachennykh dlia financirovania nakopitelnoi chasti trudovoi pensii*), which shall evidence that not less than three Eligible Pension Funds received 2013 Pension Assets, as published by the Central Bank of the Russian Federation on its official website; and

5.2.2   with respect to **the Fund Non-acceptance Event** or **the Fund Expulsion Event** – the list of non-state pension funds accepted into the Pension Savings Guarantee System as of 31 December 2015 which shall include not less than three Eligible Pension Funds and shall not include the Fund.

5.3   The Buyer and the Seller agree to sign and furnish to the Escrow Agent the Joint Release Instruction instructing the Escrow Agent to pay out to the Seller the Deferred Amount calculated in accordance with paragraph (c) of the definition of the Deferred Amount and to pay the remaining balance to the credit of the Escrow Account to the Buyer not later than 10 (ten) Business Days upon receipt of the written Notice by either Party stating that **a Transfer with a Reinvestment Condition Event** has occurred. The Notice from a Party shall be accompanied by the following evidence that the Parties agree to deem necessary and sufficient to prove the occurrence of the relevant event:

14

5.3.1   a copy of an official publication of a Federal Act in *Rossiyskaya Gazeta* or such other state media which is determined by Russian law as an official publisher of Russian legislation, pursuant to which non-state pension funds are required to reinvest all or part of 2013 Pension Assets in certain assets designated by such or another Federal Act as a condition of the transfer of 2013 Pension Assets;

5.3.2   a copy of a press release by the State Pension Fund or the Central Bank of the Russian Federation, or press releases by at least three Eligible Pension Funds or (in absence of such press releases) a copy of a Report on the transfer of pension savings designated for funding the savings-based work pension (in Russian – *Otchet o peredache sredstv pensionnikh nakoplenuiy, prednaznachennykh dlia financirovania nakopitelnoi chasti trudovoi pensii*), which shall evidence that not less than three Eligible Pension Funds received 2013 Pension Assets, as published by the Central Bank of the Russian Federation on its official website.

5.4   The Parties agree that, in the event that arbitration proceedings are commenced in accordance with Clause 21 (and unless otherwise stated in the Escrow Agreement):

5.4.1   the Claimant may, by Notice to the Respondent which may be sent within 5 (five) Business Days upon receipt of a Notice referred to in Clauses 5.1 to 5.3 above, require that the amounts to be paid to the Respondent in accordance with the Joint Release Instruction be reduced so that the balance on the Escrow Account that remains immediately after such payment is equal to the maximum amount claimed by the Claimant, pending the final award by the LCIA or the termination of the proceedings; and

5.4.2   not later than within further 5 (five) Business Days upon receipt of such Notice, the Parties shall sign and furnish to the Escrow Agent the Joint Release Instruction in such reduced amount.

## 6.   FAILURE TO ESTABLISH OR FUND THE ESCROW ACCOUNT

6.1   If the Seller fails to enter into the Escrow Agreement or fund the Escrow Account within the time frame and in accordance with terms as set out in Clauses 4.3 to 4.6, the Deferred Amount Advance shall be returned by the Seller to the Buyer not later than within five (5) Business Days upon receipt by the Seller of the written Notice from the Buyer.

6.2   If the Buyer fails to enter into the Escrow Agreement or fund the Escrow Account within the time frame and in accordance with terms as set out in Clauses 4.3 to 4.6, the Seller may, by written notice to the Buyer, adjust the Deferred Amount to the amount which shall be the higher of: (1) the Deferred Amount calculated in accordance with paragraph (a) of the definition of the Deferred Amount, and (2) the Deferred Amount Advance. Upon receipt of such Notice by the Buyer:

6.2.1   the Purchase Price shall be deemed to be equal to the sum of the Initial Amount and the Deferred Amount (as modified in accordance with this Clause 6.2.1), and in no event less than the amount then actually received from the Buyer (which shall be then equal to the sum of the Initial Amount and the Deferred Amount Advance); and

6.2.2   the Buyer shall remain liable to pay to the Seller the balance of the Deferred Amount upon occurrence of the events set out in paragraphs (a) or (c) of the definition of the Deferred Amount not later than 10 (ten) Business Days upon receipt of the written Notice by the Seller stating that a Transfer Event, or a Fund Non-acceptance Event, or a Fund Expulsion Event or a Transfer with a

15

Reinvestment Condition Event has occurred (and the provisions regarding the evidence of occurrence of the relevant event as set out Clauses 5.2 and 5.3 shall apply).

6.3    In the event that neither the Seller nor the Buyer elects to send a Notice in accordance with the provisions of this Clause 6, then:

6.3.1    the definitions of the Purchase Price and the Deferred Amount shall continue to apply without any amendment;

6.3.2    the difference between the Deferred Amount and the Deferred Amount Advance shall be paid by the Buyer to the Seller not later than 10 (ten) Business Days upon receipt of the written Notice by the Seller stating that a Transfer Event, or a Fund Non-acceptance Event or a Fund Expulsion Event has occurred;

6.3.3    the Deferred Amount Advance shall be returned by the Seller to the Buyer not later than 10 (ten) Business Days upon receipt of the written Notice by the Buyer stating that a Nationalisation Event, or a Non-transfer to Eligible Funds Event or a Competition Limitation Event has occurred; and

6.3.4    the difference between the Deferred Amount calculated in accordance with paragraph (c) of the definition of the Deferred Amount and the Deferred Amount Advance shall be returned by the Seller to the Buyer, or, as the case may be, paid by the Buyer to the Seller, not later than 10 (ten) Business Days upon receipt of the written Notice by a Party stating that a Transfer with a Reinvestment Condition Event has occurred;

and provisions regarding the evidence of occurrence of the relevant events as set out Clauses 5.1 to 5.3 shall apply.

6.4    For the avoidance of doubt, no interest shall be deemed to accrue on the balance of the Deferred Amount or the Deferred Amount Advance.

## 7.    REPRESENTATIONS AND WARRANTIES

7.1    The Seller represents and warrants to the Buyer as follows:

7.1.1    The Seller is duly incorporated and exists in accordance with the laws of the British Virgin Islands. Forzelius is duly incorporated and exists in accordance with the laws of the Republic of Cyprus.

7.1.2    Forzelius and Mr Saveliev have obtained all necessary corporate permissions and authorisations (if necessary) and any other consents required to enable them to perform their obligations under the Notarial Deed, including the consent of Mr Saveliev's spouse.

7.1.3    The Seller is able to exercise control over Forzelius so that to direct Forzelius and its Affiliates to enter into transactions described herein.

7.1.4    Compliance by the Seller or Forzelius with the terms of this Agreement will not conflict with or breach any law, legal rule or court judgment applicable to the Seller and Forzelius being in effect on the Completion Date, where such breach would adversely affect or prevent Seller or Forzelius from performing its obligations under this Agreement.

7.1.5   No receiver (including administrative receiver), liquidator, trustee, administrator or an equivalent controlling authority has been appointed in any jurisdiction in respect of the Seller, Forzelius or the Company or in respect of the whole or any part of the business or assets of the Seller, Forzelius or the Company.

7.1.6   The Sale Shares owned by Forzelius and Mr Saveliev are fully paid, free from any encumbrances, pledges, attachments, court judgments etc., which could prevent the Company, Mr Saveliev or Forzelius from performing its obligations under the Transaction Documents.

7.1.7   The Fund's Issued Shares owned by the Company on the Completion Date constitute 74.83% of the Fund's charter capital. Upon expiry of a 12 month period and not later than 14 months after the date of the state registration of the Fund as a joint stock pension fund (09 July 2014) the Company will own at least 99.7715% of the Fund's shares.

7.1.8   Mr Saveliev and Forzelius have all necessary power and authority to transfer the Sale Shares to the Buyer.

7.1.9   The Company has no other financial indebtedness to third persons, including to tax authorities and social security funds, save for the Debt and accrued interest thereon set forth in Preamble (b)(4).

7.1.10   The Fund is in possession of all necessary authorisations issued by the Governmental Authorities and required by the applicable Law to empower the Fund to conduct its activity. The Seller is not aware of any court and/or administrative proceedings where such authorisations could be revoked or suspended. The Buyer is aware of the audits performed by the Central Bank of Russia in the Fund and Avrora in connection with the Fund's acceptance in the Pension Savings Guarantee System.

7.2   The Buyer makes the following representations and warranties to the Seller:

7.2.1   The Buyer has obtained all necessary authorisations required to enable it to perform its obligations under this Agreement and other Transaction Documents to which it is a party, including the consent of the Buyer's spouse.

7.2.2   The Buyer is able to exercise control over the Nominees and the New Lender so that to direct them and their Affiliates to enter into transactions described herein.

7.2.3   Compliance by the Buyer, the Nominees and the New Lender with the terms of this Agreement will not conflict with or breach any law, legal rule or court judgment applicable to such persons, being in effect on the Completion Date, where such breach would adversely affect or prevent such persons   from performing its obligations under the Transaction Documents.

7.2.4   No receiver (including administrative receiver), liquidator, trustee, administrator or an equivalent controlling authority has been appointed in any jurisdiction in respect of the Buyer, the Nominees and the New Lender or in respect of the whole or any part of the business or assets of the Buyer, the Nominees and the New Lender.

7.2.5   The Nominees are beneficially owned by the persons indicated in the definition of the relevant Nominee.

7.2.6    The Buyer and the Nominees have all necessary power and authority to acquire the Sale Shares.

## 8.    CORPORATE ACTION; REBRANDING AND CHANGE OF DOMAIN NAME

8.1    The Parties agree that on the Completion Date the Company and the Fund shall have their names in such form and version as indicated in the Preamble to this Agreement.

8.2    The Buyer shall procure that not later than within three (3) Business Days after the Completion Date all necessary steps are taken to register changes to the shareholders of the Company in the Unified State Register of Legal Entities, and thereafter not later than within three (3) Business Days after the registration of such amendments to procure that a resolution is adopted for the change of the Company's name to another name (not containing the trademark and logo RESO) and appointment of the Company's General Director.

8.3    The Parties shall procure that on the Completion Date the Company as the sole shareholder of the Fund adopts a resolution to change the Fund's name to another name (not containing the trademark and logo RESO) and that not later than three (3) Business Days from the date of registration of the changes in the Company's participants referred to in Clause 8.2 above in the in the Unified State Register of Legal Entities relevant filings are made with the Central Bank of Russia to request approval and subsequent registration by the relevant Governmental Authority in the Unified State Register of Legal Entities of the change of the Fund's name and the state registration of the new version of the Fund's Charter.

8.4    On the next Business Day following the day on which the Fund receives from the Central Bank of Russia a registered version of the Charter containing the Fund's new name (not containing the trademark and logo RESO) the Buyer and the Seller shall ensure that the license agreement with respect to the use of the trade mark and logo RESO by the Fund is terminated.

8.5    For a period of not less than twelve (12) months from the Completion Date the Fund's website "*sbrfreso.ru*" shall display a statement, in agreed form, that the Fund's name has been changed due to its sale by RESO Group and a link to a new website administered by the Fund or the Buyer under the Fund's new name.

8.6    The Buyer shall procure that from the date following the date on which the Fund receives from the Central Bank of Russia a registered version of the Charter containing the Fund's new name (not containing the trademark and logo RESO) the Fund and the Company shall not use the name and logo RESO or the previous name and logo of the Company and the Fund (RESO Pension Investments and Sberfund RESO) in any marketing materials, mass media information and on websites.

8.7    At Completion the Seller shall transfer to the Buyer the documents of the Company as set out in the list attached as Annex 3 to this Agreement.

8.8    The Seller shall procure that in the period from the Execution Date and the Completion Date the Fund and the Company shall:

(a)    conduct their activity in the ordinary course of business substantially in the same manner in which such activity is conducted on the Execution Date;

(b)    not to procure or allow, without the Buyer's prior written consent, that any amendments, supplements, waivers or modifications are made in respect of or to any Constitutional Documents, safe for the necessary amendments and the amendments stipulated by the mandatory provisions of the applicable Law;

(c)    not to enter, without the Buyer's prior written consent, into any transactions with the value in excess of RUR 40 000 000 (forty million Roubles), including, but not limited to, mergers, accessions or acquisitions, or agree to the conclusion of such transactions, or to acquire any business, organisation or its subdivision or any other Person by way of acquisition of substantially all the assets related to such business or owned by such organisation, subdivision or any other Person or in any other way (other than the sale by the Fund of ordinary shares of OSAO "RESO-Garantia" and bonds of OOO "RESO-Leasing" for cash consideration as set out in Clause 3.5 and asset disposals referred to in Clause 3.8 of this Agreement);

(d)    not to make, without the Buyer's prior written consent, any arrangements related to the establishment of a joint venture or any other arrangements of such kind with any Person, or change the legal status, the management structure and the shareholders/participants in the existing subsidiaries and dependent companies or create new subsidiaries or dependent companies;

(e)    not to change before the Completion Date the terms of the existing Lease Agreements entered into by the Fund as of the date of this Agreement and the personnel list, the terms of the employment contracts with the employees of the Fund and local regulations relating to the salaries of the employees and the members of the Fund's management bodies;

(f)    not to declare or pay, without the Buyer's prior written consent, any dividends or other distributions to any participants and/or shareholders of the Fund and/or the Company or subsidiaries, dependent and affiliated structures of such Persons directly or indirectly controlling such shareholder.

8.9    The Buyer shall procure that on or before 15 December 2014 the authority of the existing Board of Directors of the Fund is terminated and a new Board of Directors of the Fund is elected, which shall not include representatives of the Seller.

8.10    The Buyer and the Seller shall procure that on the Completion Date the authority of the existing Board of Trustees (in Russian – *Popechitelsky Sovet*) of the Fund is terminated and a new Board of Trustees of the Fund is elected, which shall not include representatives of the Seller.

## 9.    PUBLIC ANNOUNCEMENTS; CONFIDENTIALITY

9.1    On the Completion Date the Buyer and Mr Saveliev shall make a joint statement to key Russian media (*Kommersant, Vedomosti* and *RBC*) concerning completion of the sale of the Fund. Such announcement shall be agreed by the Parties in advance and shall not disclose the Purchase Price or any other terms of the Transaction.

9.2    Save as set out in Clause 9.1:

9.2.1    the Parties shall, and shall procure that their Affiliates, officers, directors, agents and advisers as well as Forzelius, Mr Saveliev and each Nominee shall, treat as confidential the provisions of the Transaction Documents, all confidential information it possesses relating to the Company, the Fund, the Transaction and the Transaction Documents;

9.2.2    no party may, before or after Completion, make or issue a public announcement, communication or circular concerning the Transaction unless it has first obtained

19

the other parties' written consent, which may not be unreasonably withheld or delayed.

9.3     In the event that any demand is made by any Governmental Authority in respect of any document or information related to the Transaction or the Parties thereto, the Parties agree to consult in good faith in advance of delivery of any such information.

## 10.    INDEMNITIES, LIMITATION OF LIABILITY

10.1     The Seller shall indemnify the Buyer and the Nominees on the full indemnity basis against all taxes, penalties and/or other compulsory payments imposed on the Company and the Fund by the Governmental Authorities in respect of any period of the activity of the Company and (or) the Fund from their incorporation to the Completion Date (on a "Rouble for Rouble" basis). The sum of taxes, penalties and/or other compulsory payments imposed by the Governmental Authorities shall be evidenced by a duly completed document/act of the relevant Governmental Authority or by a court decision which entered into force. If the Seller proposes to contest the taxes, penalties and (or) other compulsory payments assessed to the Company and (or) the Fund, the representatives of the Seller shall be provided with appropriate documents allowing them to legally represent the Company and (or) the Fund in the relevant proceedings.

10.2     The Buyer shall indemnify the Seller, Forzelius or Mr Saveliev (on a "Rouble for Rouble" basis) against all Losses which the Seller, Forzelius or Mr Saveliev incur as a result of, or in respect of any claim by any Governmental Authority in respect of the Transaction, the change of control of the Fund, the operations of the Fund, or the assets, liabilities or financial standing of the Fund after Completion, including, without limitation any failure by the Buyer or the Nominees to obtain the anti-monopoly or the Central Bank of Russia approval for the Transaction.

10.3     The Seller and the Buyer shall not be liable in respect of any Claim unless the amount that would otherwise be recoverable from the Seller or the Buyer in respect of that Claim exceeds fifty million roubles (50,000,000) roubles.

10.4     The liability of the Buyer for the Claims made by the Seller, Forzelius and Mr Saveliev and the liability of the Seller for the Claims made by the Buyer and/or the Nominees shall be excluded if:

      (a)     the facts and circumstances giving rise to the Claim were known to the Person making such Claim or to any of its Affiliates or would have become known to any of such Persons in the course of a reasonable financial, accounting or legal due diligence performed prior to the Execution Date;

      (b)     a Party has not suffered any loss or damage giving rise to the Claim, such loss or damage is contingent or will be incurred only upon occurrence of certain conditions;

      (c)     the facts and circumstances giving rise to the Claim were Disclosed (as this term is defined below) to the Party or to its Affiliates making such Claim;

      (d)     the Claim was made or its amount was increased due to any change in the legislation or the established practice in applying the law after the Execution Date.

For the purposes of this Clause a fact or a circumstance is considered to be **"Disclosed"** if the description of such fact or circumstance is contained in the documents provided to the Buyer

or its advisors from 1 October 2014 to the Execution Date to enable the Buyer to perform financial, legal or accounting due diligence.

10.5    If any claims are made by any third parties against any of the Parties under this Agreement entitling such Party to make a Claim under this Agreement against the other Party or if there is a threat that such claim can be made the Party against which a claim is made undertakes:

   (a)    not to enter into any settlement, make a waiver or admit any debt (and shall ensure that the Fund, the Company or the Affiliates of such Party do not enter into any settlement, make a waiver or admit any debt) without the prior written consent of the other Party to this Agreement;

   (b)    to consult with the other Party to this Agreement and to furnish to such Party all necessary information and provide it with any support that may be required for the defence against such claims; and

   (c)    at the request of the Party to which a Claim may be made to authorise such Party to conduct any negotiations or proceedings related to the claims and take any steps which may be required for the satisfaction of or defence against such claims.

10.6    If any of the Parties is entitled to be indemnified or receive a compensation from a third party in respect of any fact or a circumstance connected with a Claim, such Party shall inform the other Party of such entitlement in writing and shall take such steps that may be reasonably required for the recovery of the full amount of such indemnification or compensation. The relevant Party shall keep the other Party informed as to the status of the recovery and deliver to it all the necessary information, which may be reasonably required, in respect of the recovery of such compensation or indemnification.

Upon receipt of the compensation or indemnification in accordance with Clause 10.6 of this Agreement, the indemnified Party shall be obliged:

   (a)    if the entitlement to a compensation or indemnification arose before the Party, against which a Claim was made by a Party to this Agreement, made any payments under such Claim, to decrease the amount of the Claim by the amount of such compensation or indemnification;

   (b)    if the entitlement to a compensation or indemnification arose after the Party, against which a Claim was made by a Party to this Agreement, made a payment under such Claim, to return to such Party the amount equal to the lesser of the following amounts:

      (i)    the amount paid by the Party, against which a Claim was made by the Party to this Agreement, under the relevant Claim; and

      (ii)    the full amount received by the relevant Party by way of such compensation or indemnification.

10.7    The Parties shall take all necessary action to mitigate the losses and damage incurred by them due to any non-compliance with the terms of this Agreement or breach of the warranties contained in this Agreement or in connection with any circumstances or facts as a result of which one of the Parties to this Agreement may become entitled to make Claims against the other Party.

10.8    Nothing described in this Clause of this Agreement shall limit the liability of the Parties to each other for fraud or wilful misrepresentation or the remedies available in connection therewith.

11.    **ACCEPTANCE OF THE FUND BY THE PENSION SAVINGS GUARANTEE SYSTEM**

The Parties acknowledge and agree that the risk of the Fund being accepted into the Pension Savings Guarantee System passes on to the Buyer at Completion. The Seller gives no representations or warranties in respect of the Fund's acceptance into the Pension Savings Guarantee System.

12.    **TERMINATION**

12.1    If Completion does not occur on or before 26 November 2014 (inclusive) for any reason whatsoever, then:

(a)    the Buyer shall procure that on or before 5 December 2014 the New Asset Manager transfers back to the Fund the amount of cash which was transferred by the Fund to the New Asset Manager in accordance with Clauses 3.2.2(b) and 3.4; and

(b)    the Seller shall procure that the advance of the Local Consideration and the Refinancing Loan are paid back not later than within 1 (one) Business Day upon receipt by the Fund of the cash amount referred to in Clause 12.1(a) above.

12.2    Upon completion of the actions set out in Clause 12.1 above, this Agreement and all Transaction Documents shall terminate in their entirety without notice, and without any cost or penalty to or liability of any Party.

13.    **COSTS**

Except where this Agreement or the relevant Transaction Document provides otherwise, each party shall pay its own costs relating to the negotiation, preparation, execution and performance by it of this Agreement and of each document referred to in it.

14.    **INTEREST ON OVERDUE AMOUNTS**

If a Party fails to pay a sum due from it under this Agreement on the due date of payment in accordance with the provisions of this Agreement, the amount of such debt shall be calculated in US dollars at the Exchange Rate, provided that such Party shall pay interest in US Dollars on the overdue sum from the due date of payment until the date on which its obligation to pay the sum is discharged (whether before or after judgement) at the rate of 8 per cent per annum (being, on the Execution Date, approximately 2% per annum over the yield to maturity of the medium-term US Dollar-denominated government bonds of the Russian Federation). Interest on the overdue amounts accrues from day to day and is payable upon first written demand.

15.    **WITHOLDING TAXES; NO SET OFF**

15.1    Except as otherwise provided in this Agreement, all payments made by a Party under this Agreement shall be made gross, free of right of counterclaim or set off and without deduction or withholding of any kind other than any deductions or withholding required by law.

22

15.2 If a Party makes a deduction or withholding required by law from a payment under this Agreement, the sum due from such Party shall be increased to the extent necessary to ensure that, after the making of any deduction or withholding, the relevant other Party receives a sum equal to the sum it would have received had no deduction or withholding been made.

## 16. COOPERATION

Each Party agrees to perform (or procure the performance of) all such acts and things and/or to execute and deliver (or procure the execution and delivery of) all such documents, as may be required by Law or as may be reasonably requested by the other Party for giving full effect to this Agreement and the Transaction Documents.

## 17. GENERAL

17.1 A person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Agreement.

17.2 A variation of this Agreement is valid only if it is in writing and signed by or on behalf of each party. The parties to this Agreement do not require the consent of any person having a right under the Contracts (Rights of Third Parties) Act 1999 to vary this agreement.

17.3 No waiver of any right under this Agreement or any other Transaction Document shall be effective unless in writing. Unless expressly stated otherwise a waiver shall be effective only in the circumstances for which it is given. The failure to exercise or delay in exercising a right or remedy provided by this Agreement or by law does not impair or constitute a waiver of the right or remedy or an impairment of or a waiver of other rights or remedies. No single or partial exercise of a right or remedy provided by this Agreement or by law prevents further exercise of the right or remedy or the exercise of another right or remedy.

17.4 Rights and remedies of a party contained in this Agreement are cumulative and not exclusive of rights or remedies provided by law except as otherwise expressly provided.

17.5 If any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under the laws of England and Wales, it shall be deemed to be severed from this Agreement and the remaining provisions will remain in full force. If any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction (other than the laws of England and Wales), it shall be treated as no longer applying in respect of that jurisdiction but it shall not affect (i) the validity or enforceability in that jurisdiction of any other provision of this Agreement, or (ii) the validity or enforceability in other jurisdictions of that or any other provision of this Agreement.

17.6 Except to the extent that they have been performed and except where this Agreement provides otherwise, the obligations contained in this Agreement and the other Transaction Documents remain in force after Completion.

## 18. CONFLICT BETWEEN THE TRANSACTION DOCUMENTS; NO IMPLIED REPRESENTATION

18.1 This Agreement together with other documents referred to in this Agreement, constitutes the entire agreement between the Parties in respect of its subject matter. It supersedes any preliminary agreements, intentions or arrangements (both oral and in writing) related to the subject matter of this Agreement.

18.2 The Parties acknowledge and agree that the Notarial Deed is auxiliary to this Agreement. In the event of any conflict between the provisions of this Agreement and the Notarial Deed, the provisions of this Agreement shall prevail.

18.3 Each Party covenants and confirms to the other Party that no Party or any of their respective directors, officers, employees, advisers, agents and representatives has made any assurance, commitment, condition, covenant, guarantee, indemnity, representation, statement, undertaking or warranty of any sort whatsoever (whether contractual or otherwise, oral or in writing) which is not set out in the Transaction Documents, and will not contend to the contrary.

## 19. ASSIGNMENT

19.1 No Party shall assign, transfer, declare a trust of the benefit of or in any other way alienate any of its rights or obligations under this Agreement whether in whole or in part without the prior written consent of the other Party.

## 20. NOTICES

20.1 A notice or other communication under or in connection with this Agreement (a **"Notice"**) shall be made in writing and delivered personally or sent by a recognised international courier service to the Party due to receive the Notice to the address set out in Clause 20.3 or to an alternative address specified by that Party by not less than 7 days' written notice to the other Party received before the Notice was despatched.

20.2 A Notice is deemed given, if delivered personally, at the time of delivery, and if delivered by a recognised international courier, at the time of delivery or attempted failed delivery at the address referred to in Clause 20.3.

20.3 The addresses of the Parties are:

| Name of party | Address | Marked for the attention of |
|---|---|---|
| **Seller** | 28 Oktovriou & Eleftheriou Venizelou, 277 Eden Beach Apartments, block 1, Flat/Office 502, Limassol CY-3035, Cyprus | Tatiana Kiryanova |
| **Buyer** | Vasili Michailidi, 9, 3026, Limassol, Cyprus | Melina Pavlou |

20.4 Each Party appoints Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street London EC2V 7EX, United Kingdom as its process agent in England in relation to any proceeding in connection with the Transaction or the Transaction Documents.

## 21. ARBITRATION

21.1 If any dispute, controversy or claim of whatever nature arises under, out of or in connection with this Agreement and the Transaction Documents, including any question regarding its existence, validity or termination or any non-contractual obligations arising out of or in

connection therewith (a **"Dispute"**), the Parties shall use all reasonable endeavours to resolve the matter amicably within thirty (30) days of service of the Notice of the Dispute by a Party to the other Party.

21.2    All Disputes which are unresolved pursuant to Clause 21.1 and which a Party wishes to have resolved shall be referred upon the application of any Party to, and shall be finally resolved by, arbitration under the Rules of the London Court of International Arbitration (**"LCIA"**) in force at the date of this Agreement, which Rules are deemed to be incorporated by reference to this Clause 21.

21.3    The number of arbitrators shall be three (3), one of whom shall be nominated by the Claimant(s), one by the Respondent(s) and the third of whom, who shall act as Chairman, shall be nominated by the two party-nominated arbitrators, provided that if the third arbitrator has not been nominated within thirty (30) days of the nomination of the second party-nominated arbitrator, such third arbitrator shall be appointed by the LCIA Court

21.4    The seat of the arbitration shall be London, England, all hearings shall take place in London, England and the language of the arbitration shall be English.

21.5    The arbitrators shall have the power to grant any legal or equitable remedy or relief available under law, including injunctive relief (whether interim and/or final) and specific performance and any measures ordered by the arbitrators may be specifically enforced by any court of competent jurisdiction. Each Party retains the right to seek interim or provisional measures, including injunctive relief and including pre-arbitral attachments or injunctions, from any court of competent jurisdiction and any such request shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate. For the avoidance of doubt, this Clause is not intended to limit the powers of the court exercisable in support of arbitration proceedings pursuant to s.44 of the Arbitration Act 1996.

21.6    The Parties agree that any Disputes that involve matters regulated simultaneously by this Agreement and other Transaction Documents shall be resolved under the terms of this Agreement only and no separate claim shall be brought under the other Transaction Documents.

## 22.    GOVERNING LAW

This Agreement and any non-contractual obligation or other matter arising out of or in connection with it shall be governed by and construed in accordance with the laws of England and Wales.

## 23.    GOVERNING LANGUAGE

23.1    This Agreement is drawn up in the English language. If this Agreement is translated into another language, the English language text shall prevail.

23.2    Each Notice, demand, request, statement, instrument, certificate or other communication given, delivered or made by a party to any other party under or in connection with this Agreement shall be in English.

## 24.    COUNTERPARTS

This Agreement may be executed in any number of counterparts, each of which when executed and delivered is an original and all of which together evidence the same agreement.

IN WITNESS WHEREOF **THIS AGREEMENT HAS BEEN SIGNED AS A DEED BY EACH OF THE PARTIES HERETO AND IS INTENDED TO BE AND IS HEREBY DELIVERED BY IT AS A DEED ON THE DATE SPECIFIED ABOVE.**


**EXECUTED** as a **DEED**                                    )
by **ANATOLY LEONIDOVICH MOTYLEV**          )          ………………………………………...


in the presence of

Witness:                    Signature:

                            Name:

                            Address:

                            Occupation:


**EXECUTED** as a **DEED**                                    )
by **MEGAINVEST OVERSEAS LIMITED**          )
represented by Andrey Nickolaevich Saveliev     )          ………………………………………...
attoney-in-fact                                          )


in the presence of

Witness:                    Signature:

                            Name:

                            Address:

                            Occupation:

**ANNEX 1 - NON-ELIGIBLE PENSION FUNDS**

Funds controlled by the federal or regional governments or majority state-owned companies. The Parties agree that the following funds were not Eligible Pension Funds as of the date of this Agreement:

1. OAO "Non-state pension fund "GazFond Pension Savings"

2. ZAO "Non-state pension fund of the Sberbank"

3. AO "Non-state pension fund "VTB Pension Fund"

4. OAO "Non-state pension fund "Blagosostoyanie OPS"

5. ZAO "Non-state pension fund "PromagroFund"

6. ZAO "KIT Finance non-state pension fund"

7. ZAO "Non-state pension fund "Nasledie"

8. AO "Non-state pension fund "Neftegarant"

9. OAO "Khanty-Mansiysky non-state pension fund"

10. Non-state pension fund "Transneft"

ANNEX 2 –ASSETS LIST OF THE FUND AS OF 31 OCTOBER 2014 (IN RUSSIAN)

**ANNEX 3 – LIST OF DOCUMENTS OF THE COMPANY TO BE TRANSFERRED  BY THE SELLER TO THE BUYER (IN RUSSIAN)**

# ВЕДОМОСТИ

## Владелец банка «Российский кредит» Мотылев контролирует минимум пять пенсионных фондов

На их деньги он мог покупать часть своих банковских активов

Наталия Биянова
Дарья Борисяк
**Vedomosti.ru**
15.07.2014

Владелец банка «Российский кредит» Анатолий Мотылев контролирует минимум пять пенсионных фондов, указывают участники рынка. Мотылев — бывший владелец Глобэкс-банка, санация которого в 2008 г. обошлась государству в 87 млрд руб. С той поры он собрал новую банковскую группу, а в течение последнего года — еще и группу пенсионных фондов, рассказали «Ведомостям» несколько участников рынка, два консультанта по сделкам M&A на пенсионном рынке, а также знакомый Мотылева.

Официально Мотылев раскрыл себя лишь как владельца «Российского кредита» (в 2012 г. он с партнерами приобрел его у Бориса Иванишвили) и пенсионного фонда «Ренессанс жизнь и пенсии» (летом 2013 г. купил его у Бориса Йордана). Однако это только видимая часть финансовой группы — участники банковского рынка и контрагенты Мотылева уверены, что он контролирует также «АМБ банк» (входит в его совет директоров), М-банк (в июне «Роскредит» сообщил о его присоединении), а также банк КРК, у которого 11 июля была отозвана лицензия — прямо в разгар сделки по присоединению КРК к «Роскредиту».

Та же история с пенсионными активами — за год Мотылев приобрел еще минимум четыре фонда, рассказывают собеседники «Ведомостей». Как меняется собственник фонда, не видит даже регулятор — это некоммерческая организация. По словам источника, близкого к ЦБ, «регулятор сейчас точно не знает, сколько НПФ у Мотылева».



⌂   ☒   ✉                                                     рус   eng      search for          Submi



New horizons
and discoveries

**ABOUT US**

General information
Administration
Charter
Licence
Bank Details
Financial information
Correspondent-Bussines
Counteraction legalization of
the incomes received by a
criminal way
Contacts





Deposit
Insurance
System

**ADMINISTRATION**

**BOARD OF DIRECTORS**

    Sergey V. Goryashin
    Andrey Y. Loginov
    Anatoly L. Motylev
    Elena V. Vikhoreva
    Andrey A. Yakovlev

**CHAIRMAN OF THE BOARD (INDIVIDUAL EXECUTIVE BODY)**

    Andrey Y. Loginov
    Graduated from:
    Moscow Finance Institute. Specialization – Accounting, audit and business analysis.
    Moscow State Law Academy. Specialization – Master of Laws.

**CHIEF ACCOUNTANT**

    Valentina M. Zuykova
    Graduated from Plekhanov Russian Economic Academy. Specialization — Finance and credit.

**HEAD OF INTERNAL AUDIT SERVICE**

    Natalya I. Zhilyaeva
    Graduated from Moscow Finance Institute.

Active content removed



## interfax

Subscription and demo access
Our news products:

About Interfax

Press Releases

Products & Services

Contact Us

Customer Login

Interfax.com | Interfax news | New owners of Rossiysky Kredit to develop all... Site map

### Headlines

11/27 14:45  RZD'S DEBT LEVEL PREVENTS IT FROM BORROWING LARGE AMOUNTS ON ASIAN MARKETS - YAKUNIN

11/27 14:45  Russian Standard Bank wants to extend maturity on subordinated Eurobonds, increase rate

11/27 14:43  Raiffeisenbank 9M IFRS earnings down 13% to 14 bln rubles

11/27 14:42  Russian Defense Ministry sees U.S. global missile defense project as threat to Asia Pacific rgn (Part 2)

11/27 14:40  Sistema revenue without Bashneft at $12.7 bln in 9M; net income - $240 mln

11/27 14:39  Five Ukrainian soldiers injured in east in past 24 hours

## · News headles

Interviews

May 11, 2012 09:14

### New owners of Rossiysky Kredit to develop all banking services, including retail

MOSCOW. May 11 (Interfax) - Rossiysky Kredit Bank, which specializes in work with securities and financing investment projects, will develop all areas of business, including retail banking, following its change of owners.

The bank's strategy will be approved by its new board of directors, one of Rossiysky Kredit's new owners, Anatoly Motylev told Interfax.

"All areas of banking, including retail, will definitely be developed," Motylev said.

The Unikor group, which manages the assets of former Metalloinvest co-owner Boris Ivanishvili, announced on Thursday that it had signed an agreement with private investors to sell Rossiysky Kredit. The deal, which is to be closed by September 1, is worth $352 million.

The buyers includes the president of IT company Lanit, Georgy Gens; Motylev, the former owner of Globex Bank; the former owner of insurer Spasskiye Vorota, Boris Khait; as well as Boris Pastukhov, Viktor Lukoyanov and Vladimir Faerovich.

### Paul Myler: We are going to see some changes in Russia's food policy by February-March

Australian Ambassador to Russia Paul Myler has given an interview to Interfax ahead of the G20 summit in Brisbane in which he speaks about the MH17 crash, the reasons for joining the West's sanctions against Russia and explained why Australia expects changes in Russia's food policy by March 2015.

more

### Arkady Rotenberg: We live in conditions of tough competition, but it doesn't scare us

addition to Ivanishvili, one of Rossiysky Kredit's shareholders at the time was Vitaly Malkin, who is now a senator representing Buryatia.

Along with Menatep, OneximBank, SBS Agro and Most Bank, Rossiysky Kredit crashed in the 1998 crisis, but it survived thanks to being taken over by the Agency for Restructuring Lending Institutions (ARKO) in 1999. Impexbank, which was sold to the Raiffeisenbank group in 2006, acted as a bridge bank for it.

Rossiysky Kredit completed restructuring in mid-2003 and emerged from under the management of ARKO. The bank's charter capital was increased to 1.84 billion rubles.

Rossiysky Kredit now specializes in work with securities and financing investment projects, particularly investment in commercial real estate and the Moscow hotel industry. For example, the bank is an investor in the reconstruction of the Minsk hotel in central Moscow, which recently opened as the InterContinental Moscow Tverskaya; this was a development project of Unikor.

Vp

(Our editorial staff can be reached at eng.editors@interfax.ru)

/Interfax/

⊃ Subscription

You can access a demo version of, receive more information about or subscribe to Interfax publications by filling in and returning the form below. We also have dozens of reports in the Russian language, please indicate if you are interested.

Title:
----- select -----

First name:

Last name:

Phone:

Company:

Division:

E-mail:

Country:
----- select -----

City:

Products:

☐ Central Asia & Caucasus Business Weekly
☐ Central Asia General Newswire
☑ Global Gas Analytics
☐ Global Natural Gas Daily
☐ Interfax Via Bloomberg Terminal
☐ Kazakhstan General Newswire
☐ Kazakhstan Mining Weekly

<div style="text-align:center; border:1px solid">

**ПОЛНАЯ СТОИМОСТЬ ПОТРЕБИТЕЛЬСКОГО КРЕДИТА: ТРИНАДЦАТЬ ЦЕЛЫХ ВОСЕМЬДЕСЯТ ДВЕ СОТЫХ ПРОЦЕНТОВ ГОДОВЫХ**

</div>

Информационный блок:

| | | | |
|---|---|---|---|
| Заёмщик: Мотылев Анатолий Леонидович | Паспорт: 4511 352848 выдан Отделением УФМС России по гор. Москве по району Хамовники 06.09.2011 г. к/п 770-011 | Место нахождения Заёмщика: 119121, г. Москва, Ростовская наб., д. 5, кв. 154 | Адрес для направления корреспонденции: тот же. |
| E-mail: - | Номер телефона: - | Номер мобильного телефона: 8(985)768-88-43 | Место получения Заёмщиком оферты: 105187, г. Москва, ул. Ткацкая, д. 36 |
| Договор № Д-408/14 от 20.11.2014 г. | Номер Счета: 40817.810.1.00989873793 | | Дата предоставления Заёмщику Индивидуальных условий 20.11.2014 г. |

Индивидуальные условия договора потребительского кредита № Д-408/14 от «20» ноября 2014 г.

| № п/п | Условие | Содержание условия |
|---|---|---|
| 1. | Сумма кредита или лимит кредитования и порядок его изменения | Лимит кредитования 3 675 000 000,00 (Три миллиарда шестьсот семьдесят пять миллионов, 00/100) рублей, на условиях невозобновляемой кредитной линии. Лимит изменяется только по соглашению Сторон. |
| 2. | Срок действия договора, срок возврата кредита | Договор действует до полного исполнения Сторонами своих обязательств. Лимит устанавливается (кредитная линия открывается) на срок до «28» ноября 2014 года (включительно). Кредиты в рамках Кредитной линии предоставляются на срок до «28» ноября 2014 года и подлежат возврату в соответствии с Графиком платежей до «28» ноября 2014 года (включительно). |
| 3. | Валюта, в которой предоставляется кредит | рубли Российской Федерации |
| 4. | Процентная ставка (процентные ставки) (в процентах годовых) или порядок её (их) определения | 13,56 % годовых. |
| 5. | Порядок определения курса иностранной валюты при переводе денежных средств кредитором третьему лицу, указанному заемщиком | Не применимо. |

Продолжение Индивидуальных условий Кредитного договора № Д-408/14 от «20» ноября 2014 г. на 2 листах.

Заёмщик    Мотылев Анатолий Леонидович
       Фамилия, имя, отчество (полностью)                        (Подпись)

ЭКЗЕМПЛЯР ЗАЁМЩИКА

| № п/п | Условие | Содержание условия |
|---|---|---|
| 6. | Количество, размер и периодичность (сроки) платежей заемщика по договору или порядок определения этих платежей | - в конце срока возврата Кредита осуществляется возврат суммы Основного долга и процентов;<br>- при досрочном погашении Кредита (его части) проценты на сумму возвращенного Кредита (его части), рассчитанные за период фактического пользования данными денежными средствами, уплачиваются в день такого погашения. |
| 7. | Порядок изменения количества, размера и периодичности (сроков) платежей заемщика при частичном досрочном возврате кредита | - Сумма платежей по Договору изменяется, количество и периодичность платежей не изменяется<br><br>При этом новая (уменьшенная) сумма и/или количество предстоящих платежей по Договору указывается в Графике платежей, предоставленном Банком Заемщику в соответствии с Договором. |
| 8. | Способы исполнения заемщиком обязательств по договору по месту нахождения заемщика | Исполнение Заемщиком обязательств по Договору, связанных с погашением Задолженности, осуществляется путем размещения на Счете денежных средств, и их дальнейшего списания Банком в погашение Задолженности (с учетом очередности списания денежных средств, определенной в Договоре). Такие денежные средства могут быть размещены на Счете путем безналичного перевода денежных средств на Счет, внесения денежных средств в кассу Банка для зачисления на Счет, а также иным способом, разрешенным законодательством Российской Федерации. |
| 8.1 | Бесплатный способ исполнения заемщиком обязательств по договору | При наличии в месте получения Заемщиком оферты, указанном выше в Информационном блоке (далее – Место получения оферты), структурного подразделения Банка, оборудованного кассой, (далее – Подразделение) бесплатным способом исполнения обязательств для Заемщика является внесение на Счет денежных средств через кассу такого Подразделения.<br>Адреса Подразделений Банка доступны на сайте Банка www.rsb.ru, в Call-Центре Русский Стандарт и в структурных подразделениях Банка. |
| 9. | Обязанность заемщика заключить иные договоры | Заемщик обязан заключить договор банковского счета с Банком. |
| 10. | Обязанность заемщика по предоставлению обеспечения исполнения обязательств по договору и требования к такому обеспечению | Обеспечение в виде поручительства, предоставленного Обществом с ограниченной ответственностью «ТЕХНОМАРК» (ООО «ТЕХНОМАРК»), с размещением поручителем в Банке депозита (гарантийного депозита) на следующих условиях: договор поручительства оформляется под каждую часть Кредита, выданную по соответствующему заявлению Заемщика. В целях обеспечения своих обязательств поручитель размещает в Банке депозит в сумме, достаточной для погашения Задолженности. |
| 11. | Цели использования заемщиком потребительского кредита (займа) | Кредит предоставляется Банком Заемщику на потребительские цели. |
| 12. | Ответственность заемщика за ненадлежащее исполнение условий договора, размер неустойки (штрафа, пени) или порядок их определения | Размер неустойки (штрафа, пени) за неисполнение или ненадлежащее исполнение Заемщиком обязательств по возврату Кредита и (или) уплате процентов на сумму Кредита составляет 0,1% от суммы просроченной Задолженности за каждый день просрочки. |

Продолжение Индивидуальных условий Кредитного договора № Д-408/14 от «20» ноября 2014 с на 7 листах

Заемщик   <u>Мотылев Анатолий Леонидович</u>
        Фамилия, имя, отчество (полностью)                      (Подпись)

**ЭКЗЕМПЛЯР ЗАЕМЩИКА**

| № п/п | Условие | Содержание условия |
|---|---|---|
| 13. | Условие об уступке кредитором третьим лицам прав (требований) по договору | Банк вправе уступить (передать) полностью или частично свои права (требования) по Договору любым третьим лицам, в том числе не имеющим лицензии на право осуществления банковской деятельности, при этом Банк передает такому третьему лицу (уполномоченным им лицам) документы, удостоверяющие право (требование) и сообщает сведения, имеющие значение для осуществления этого права (требования), в том числе о Заемщике и Задолженности. |
| 14. | Согласие заемщика с общими условиями договора | Заемщик, подписывая настоящий документ, соглашается с Общими условиями по потребительским кредитам, оформляемым Управлением корпоративного бизнеса ЗАО «Банк Русский Стандарт» (далее – Условия), являющимися общими условиями Кредитного договора, а также подтверждает, что он ознакомлен с данным документом и понимает его содержание. |
| 15. | Услуги, оказываемые кредитором заемщику за отдельную плату и необходимые для заключения договора, их цена или порядок ее определения, а также согласие заемщика на оказание таких услуг | Операции по Счету, связанные с исполнением обязательств по Договору осуществляются бесплатно. |
| 16. | Способ обмена информацией между кредитором и заемщиком | Информация (в том числе о просроченной Задолженности, об изменении Условий и Индивидуальных условий) направляется Банком Заемщику, по усмотрению Банка: 1) путем направления почтового отправления; 2) путем направления электронного письма по адресу электронной почты Заемщика; 3) путем вручения лично Заемщику; 4) путем телефонных переговоров; 5) путем направления SMS-сообщений. Заемщик предоставляет информацию Банку по всем вопросам: обратившись с письменным заявлением в структурное подразделение Банка либо направив почтовое отправление по адресу места нахождения Банка. Такие сообщения должны быть сделаны Заемщиком в письменном виде (с предоставлением подтверждающих документов) в течение 5 (пяти) календарных дней с момента изменений/появления вышеназванных обстоятельств и направляется по местонахождению Банка. |
| 17. | Территориальная подсудность дела по иску кредитора к заемщику | Споры по иску Банка (кредитора) к Заемщику, в том числе о взыскании денежных средств, возникающие между Банком и Заемщиком по Договору, подлежат разрешению по месту нахождения Банка – в Измайловском районном суде г. Москвы / мировым судьей судебного участка № 296 района «Соколиная гора» г. Москвы (в зависимости от родовой подсудности спора). В случае неисполнения Заемщиком своих обязательств по Договору и обращения Банком в судебные органы может быть использована процедура взыскания Задолженности по Договору с Заемщика в порядке приказного судопроизводства в судах, указанных выше. |
| 18. | Термины и определения | Все термины, написанные в настоящем документе с заглавной буквы, имеют то же значение, что и в Условиях. |
| 19. | Условия выставления Заключительного требования, за исключением определенных в Условиях | Не применимо. |
| 20. | Порядок предоставления Кредита | Кредит (часть Кредита) в рамках Лимита предоставляется в дату, указанную в заявлении Заемщика при заключении поручителем с Банком договоров, указанных в п.10 настоящих Индивидуальных условий |

Продолжение Индивидуальных условий Кредитного договора № Д-408/14 от «20» ноября 2014 г. на 2 листах.

Заемщик    Мотылев Анатолий Леонидович
             Фамилия, имя, отчество (полностью)                              (Подпись)

ЭКЗЕМПЛЯР ЗАЕМЩИКА

| № п/п | Условие | Содержание условия |
|-------|---------|--------------------|
| 21. | Иные условия | |
| | | |

Настоящим ЗАО «Банк Русский Стандарт» (место нахождения: Российская Федерация, 105187, г. Москва, ул. Ткацкая, д. 36, генеральная лицензия на осуществление банковских операций № 2289, выдана 19 июля 2001 года Банком России) предлагает (делает оферту) Вам - физическому лицу, данные которого указаны выше в Информационном блоке, заключить Кредитный договор на условиях, изложенных выше в Индивидуальных условиях и Условиях, являющихся общими условиями Кредитного договора. Кредитный договор будет считаться заключенным, если Банк получит от Вас подписанный с Вашей стороны настоящий документ в течение 5 рабочих дней с даты предоставления Вам Индивидуальных условий.

Председатель Правления _____ Левин Д.О.

Настоящим я, физическое лицо, данные которого указаны выше в Информационном блоке, принимаю предложение (оферту) Банка заключить Кредитный договор на условиях, изложенных выше в Индивидуальных условиях и Общие условия по потребительским кредитам, оформляемым Подразделением корпоративного бизнеса ЗАО «Банк Русский Стандарт», являющихся общими условиями Кредитного договора (далее – Условия), в связи с чем передаю Банку настоящий документ, подписанный с моей стороны. Я подтверждаю, что я полностью согласен с Индивидуальными условиями и Условиями, понимаю содержание обоих документов и их положения обязуюсь соблюдать. Я подтверждаю, что между мной и Банком достигнуто согласие по всем условиям Кредитного договора. Также я подтверждаю получение мной одного экземпляра настоящего документа, Графика платежей и Условий.

Настоящим я предоставляю Банку право (заранее данный акцепт) без моих дополнительных распоряжений списывать с моего банковского счета № 40817.810.1.00989873793, который открыт в Банке, денежные средства в погашение задолженности по Кредитному договору.

Настоящим я предоставляю Банку право (заранее данный акцепт) без моих дополнительных распоряжений списывать с банковского/-х счет/-ов № 40817.840.4.00987851267, которые открыты в Банке денежные средства в погашение задолженности по Кредитному договору.

Заемщик _____ _____ 28.11.2014
Фамилия, имя, отчество (полностью)          (Подпись)   (Дата от руки)

Продолжение Индивидуальных условий Кредитного договора № Д-408/14 от «20» ноября 2014 г. на 2 листах

Заемщик   **Мотылев Анатолий Леонидович**
          Фамилия, имя, отчество (полностью)                                    (Подпись)

**ЭКЗЕМПЛЯР ЗАЕМЩИКА**



**МИНФИН РОССИИ**
**ФЕДЕРАЛЬНАЯ НАЛОГОВАЯ СЛУЖБА**
УФНС РОССИИ ПО г.МОСКВЕ
**ИНСПЕКЦИЯ**
**ФЕДЕРАЛЬНОЙ НАЛОГОВОЙ СЛУЖБЫ № 4**
**ПО г.МОСКВЕ**
(ИФНС России № 4 по г.Москве)

ул.Доватора, д.12,корп.2,стр.5 г.Москва, 119048
Телефон: (499) 245 67 96; факс (499) 245 68 20
www.r77.nalog.ru

03.09.2013 № 17-14/044327

На № _46937_

О предоставлении информации

**МОТЫЛЕВ АНАТОЛИЙ ЛЕОНИДОВИЧ**

наб Ростовская, 5, , 154 Москва г, 119121

Инспекция Федеральной налоговой службы №4 по г. Москве сообщает, что МОТЫЛЕВ АНАТОЛИЙ ЛЕОНИДОВИЧ ИНН 770400215580, проживающий по адресу: Москва г., наб. Ростовская, д.5, кв.154, состоит на учете в инспекции.

Согласно представленной декларации о доходах по форме 3-НДФЛ за 2012г. общая сумма дохода, подлежащего налогообложению составила 159357162руб.36коп. (сто пятьдесят девять миллионов триста пятьдесят семь тысяч сто шестьдесят два рубля, 36копеек). Сумма налога, перечисленная в бюджет составила 20645232руб.

**Заместитель начальника инспекции**
**Советник государственной гражданской**
**службы Российской Федерации 2 класса**                    О.И. Горбунова

Печникова Татьяна Ивановна
495 400-03-80



**МИНФИН РОССИИ**
**ФЕДЕРАЛЬНАЯ НАЛОГОВАЯ СЛУЖБА**
УПРАВЛЕНИЕ ФЕДЕРАЛЬНОЙ НАЛОГОВОЙ СЛУЖБЫ по
г.МОСКВЕ
**ИНСПЕКЦИЯ ФНС РОССИИ № 4**
**ПО г. МОСКВЕ**
(ИФНС России № 4 по г.Москве)

ул.Доватора, д.12,корп.2,стр.5 г.Москва, 119048
Телефон: (095) 245 67 96; факс (095) 245 68 20
E-mail: admin4@mosnalog.ru

12. 02. 2008 № 17-11/11905

На № 02-29/05765 от 07/02/2008г

Мотылев А.Л.

119121 г. Москва
Ростовская наб дом 5 кв 154

/справка о доходах/

Инспекция Федеральной налоговой службы РФ №4 по г. Москве сообщает, что Мотылев Анатолий Леонидович, проживающий по адресу: г. Москва Ростовская наб дом 5 кв 154, зарегистрирован в инспекции в качестве налогоплательщика.
Доход 2006г. по данным, указанным налогоплательщиком в декларации, составил 383.588.068,50руб. Налог оплачен в полном размере.

Заместитель начальника ИФНС №4 по г. Москве
Советник государственной гражданской
службы РФ 2 класса                                         /О.И. Горбунова/

Качанова Л.Н.
245-68-08

*Мотылеву*
*Анатолию Леонидовичу*

119121 г.Москва
Ростовская наб.
д.5 кв.154



**ФНС РОССИИ**
Управление ФНС России по г.Москве
**Инспекция Федеральной налоговой**
**службы № 4 по г.Москве**
(ИФНС России № 4 по г.Москве)

ул. Доватора, д.12,корп.2,стр.5 г. Москва, 119048
Телефон (095) 245-67-96; Факс (095) 245-68-20
E-mail: admin4@mosnalog.ru

16 ФЕВ 2006   № *17-29/ 5071*

На № _____

*Справка о доходах*

Инспекция ФНС РФ № 4 по г. Москве, в ответ на Ваше заявление №1279 от 06.02.2006г, сообщает, что Мотылев Анатолий Леонидович , проживающий по адресу: г. Москва, Ростовская наб, д. 5 кв.154, состоит на учете в инспекции, ИНН 770400215580. За 2004год подана декларация о доходах , согласно которой сумма дохода составила – 337993441,94руб.

Справка выдана для предоставления в ЦБ РФ.

Зам.руководителя инспекции                                         О.И.Горбунова
ФНС РФ № 4 по г. Москве
Советник налоговой службы РФ
III ранга

*Салтанова Н.А.*
*(495)245-68-08*



**ФНС РОССИИ**
Управление ФНС России по г.Москве
**Инспекция Федеральной налоговой
службы № 4 по г.Москве**
**(ИФНС России № 4 по г.Москве)**

ул. Доватора, д.12,корп.2,стр.5 г. Москва, 119048
Телефон (095) 245-67-96; Факс (095) 245-68-20
E-mail: admin4@mosnalog.ru

22.02.07 № 17-29/ 12

На № 02-29/06647 от 07/02/2007г

**Мотылев А.Л.
г. Москва
Ростовская наб дом 5 кв 154**

/справка о доходах/

 Инспекция Федеральной налоговой службы РФ №4 по г. Москве сообщает, что  Мотылев Анатолий Леонидович , паспорт РФ 45 03 486077 выдан. П/с №1 ОВД «Хамовники» г. Москвы, проживающий по адресу: г. Москва   Ростовская наб дом 5 кв 154, зарегистрирован в инспекции в качестве налогоплательщика.
За 20004 и 2005г. поданы декларации о доходах.
Доход 2004г. по данным налогоплательщика составил 337.993.441,94руб..
Доход 2005г. по данным налогоплательщика составил 323.743.743,02руб..

Справка выдана для предоставления  в контролирующие органы ЦБ РФ.

Зам. Начальника ИФНС №4 по г. Москве
Советник государственной гражданской
 службы РФ 3 класса                                                                    /О.И. Горбунова/

Качанова Л.Н.



**МНС РОССИИ**

УПРАВЛЕНИЕ МИНИСТЕРСТВА РОССИЙСКОЙ
ФЕДЕРАЦИИ ПО НАЛОГАМ И СБОРАМ
по г.МОСКВЕ

Инспекция Министерства Российской Федерации
по налогам и сборам № 4 по Центральному
административному округу г.Москвы

**(ИМНС России № 4 по ЦАО г. Москвы)**

ул. Доватора, д. 12, корп. 2, стр. 5, г. Москва, 119048
Телефон (095) 245 67 96; Факс (095) 245 68 20
E-mail: admin@mosnalog.ru

№ _14-16/38124_

На № _____

Мотылев А.Л.

г. Москва
Ростовская наб. дом 5 кв 154

 

 

 

Инспекция МНС РФ № 4 ЦАО г. Москвы сообщает, что Мотылев Анатолий Леонидович (ИНН 770400215580), проживающий по адресу: г. Москва Ростовская наб. дом 5 кв 154, зарегистрирован в инспекции в качестве налогоплательщика. За 2002г и 2003г. были поданы декларации, в соответствии с которыми доход в 2002г. составил 95.770.156,67 руб., в 2003г. составил 337.149.387,79 руб.

 

Справка дана для предоставления в контролирующие органы ЦБ.

 

Зам. руководителя инспекции
МНС РФ № 4 ЦАО г. Москвы.
Советник налоговой
службы РФ I ранга                                          О.Н. Ионкина

исп. Качанова Л.Н.
тел. 245-68-08



**МИНФИН РОССИИ**
**ФЕДЕРАЛЬНАЯ НАЛОГОВАЯ СЛУЖБА**
УФНС РОССИИ ПО г.МОСКВЕ
**ИНСПЕКЦИЯ**
**ФЕДЕРАЛЬНОЙ НАЛОГОВОЙ СЛУЖБЫ № 4**
**ПО г.МОСКВЕ**
(ИФНС России № 4 по г.Москве)

ул.Доватора, д.12,корп.2,стр.5 г.Москва, 119048
Телефон: (495) 400 03 73; факс (495) 400 03 92
www.r77.nalog.ru

_____ №_____

На № ___66876 18.11.2014_____

**МОТЫЛЕВ АНАТОЛИЙ
ЛЕОНИДОВИЧ**

наб Ростовская, 5, , 154 Москва г,
119121

О предоставлении информации

    ИФНС №4 по г. Москве   сообщает, что МОТЫЛЕВ АНАТОЛИЙ ЛЕОНИДОВИЧ ИНН 770400215580, проживающий по адресу: Москва г., наб. Ростовская, д.5, кв.154, состоит на учете в инспекции.

    Согласно представленной декларации о доходах по форме 3-НДФЛ за 2013г. общая сумма дохода, подлежащего налогообложению составила: 776167434руб.00коп. (семьсот семьдесят шесть  миллионов сто шестьдесят семь тысяч четыреста тридцать четыре  рубля, 00копеек). Сумма налога, перечисленная в бюджет составила 70331273.00руб.

Заместитель начальника инспекции
Советник государственной гражданской
службы Российской Федерации 2 класса
М.П.

О.И. Горбунова

Печникова Татьяна Ивановна
495 400-03-80