**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re *Ex Parte* Application of Kevin Hellard and
Jonathan Thielmann, Joint Trustees in Bankruptcy
of Anatoly Leonidovich Motylev, pursuant to 28
U.S.C. § 1782 to Conduct Discovery for Use in a
Foreign Proceeding,

                     Petitioner.

Misc. Case No. 21-mc-00864

**MEMORANDUM OF LAW IN SUPPORT OF THE JOINT TRUSTEES' OPPOSITION
TO MEGAINVEST OVERSEAS LIMITED'S LIMITED MOTION TO VACATE
ORDER AND QUASH SUBPOENA**

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212-589-4200
Facsimile: 212-589-4201

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

FACTS ...............................................................................................................................3

ARGUMENT ......................................................................................................................9

    I.    THE DISCOVERY SOUGHT BY THE JOINT TRUSTEES IS FOR USE IN A FOREIGN PROCEEDING ................................................................................10

    II.    THE FIRST *INTEL* FACTOR FAVORS PERMITTING THE SUBPOENA TO ISSUE ......................................................................................................15

    III.    THE THIRD *INTEL* FACTOR FAVORS PERMITTING THE SUBPOENA TO ISSUE ......................................................................................................18

    IV.    THE FOURTH *INTEL* FACTOR FAVORS PERMITTING THE SUBPOENA TO ISSUE ..............................................................................................19

    V.    MEGAINVEST DOES NOT HAVE STANDING TO QUASH THE SUBPOENA ...................................................................................................23

CONCLUSION...................................................................................................................24

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Accent Delight Int'l Ltd.*,
    869 F.3d 121 (2d Cir. 2017).............................................................................9, 18

*In re Accent Delight Int'l Ltd.*,
    791 App'x 247 (2d Cir. 2019).................................................................................18

*Agoado v. Midland Funding LLC*,
    CV 14-18 (WFK) (AKT), 2021 WL 4355864 (E.D.N.Y. Sept. 23, 2021) .............................21

*Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*,
    785 F. Supp. 2d 434 (S.D.N.Y. 2011)......................................................................18

*In re Application For An Order Permitting Metallgesellschaft AG To Take Discovery*,
    121 F.3d 77 (2d Cir. 1997)..............................................................................14, 16

*In re Application of Hill*,
    No. M19-117 (RJH), 2005 WL 1330769 (S.D.N.Y. June 3, 2005)...................................11, 12

*In re Application of Hornbeam Corp.*,
    No. 14 Misc. 424, 2014 WL 8775453 (S.D.N.Y. Dec. 24, 2014) ....................................18, 19

*In re Application of Malev Hungarian Airlines*,
    964 F.2d 97 (2d Cir. 1992)................................................................15, 16, 17, 18

*Ayyash v. Crowe Horwath LLP*,
    No. 17-MC-482 (AJN), 2018 WL 2976017 (S.D.N.Y. June 13, 2018)..................................15

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
    673 F.3d 76 (2d Cir. 2016)....................................................................................9

*In re Catalyst Managerial Svc. DMCC*,
    680 Fed. App'x 37 (2d Cir. 2017)........................................................................21, 22

*Certain Funds, Accounts and/or Inv. Vehicles v. KPMG, L.L.P.*,
    798 F.3d 113 (2d Cir. 2015)................................................................................9, 15

*Euromepa S.A. v R. Esmerian, Inc.*,
    51 F.3d 1095 (2d Cir. 1995)...................................................................................16

*In re Gissin*
    649 Fed. App'x 27 (2d Cir. 2016).............................................................................11

*Gorsoan Ltd. v. Bullock*,
  652 F. App'x 7 (2d Cir. 2016) ........................................................................17, 18

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241 (2004) ............................................................................... *passim*

*In re JSC BTA Bank*,
  No. 21 Misc. 824 (GHW) (GWG), 2021 WL 6111916 (S.D.N.Y. Dec. 27,
  2021) ..................................................................................................................22

*Lancaster Factoring Co. v. Mangone*,
  90 F.3d 38 (2d Cir. 1996).........................................................................10, 11

*Lazaridis v. Int'l Ctr. for Missing and Exploited Children, Inc.*,
  760 F. Supp. 2d 109 (D.D.C. 2011) .................................................................14

*Mees v. Buiter*,
  793 F.3d 291 (2d Cir. 2015).............................................................................22

*Nova Products, Inc. v. Kisma Video, Inc.*,
  220 F.R.D. 238 (S.D.N.Y.2004) ......................................................................23

*In re Pidwell*,
  21-MC-0166 (ALC) (KHP), 2022 WL 192987 (S.D.N.Y. Jan. 21, 2022) .........2, 17

*In re Postalis*,
  No. 18-MC-497(JGK), 2018 WL 6725406 (S.D.N.Y. Dec. 20, 2018)..................14

*Schmitz v. Bernstein Liebhard & Lifshitz, LLP*,
  376 F.3d 79 (2d Cir. 2004)..................................................................................9

*In re Tiberius Group AG*,
  19-MC-467 (VSB), 2020 WL 1140784 (S.D.N.Y. Mar. 6, 2020).........................18

*Estate of Ungar v. Palestinian Auth.*,
  332 F. App'x 643 (2d Cir. 2009) ......................................................................23

*United States Regional Econ. Dev. Auth., LLC v. Matthews*,
  No. 3:16-cv-10193(CSH), 2018 WL 2172713 (D. Conn. May 10, 2018).............23

**Statutes**

28 U.S.C. § 1782 .................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 45 ..............................................................................................23

Petitioners Kevin Hellard and Jonathan Thielmann, as Joint Trustees in the English Bankruptcy of Anatoly Leonidovich Motylev (the "Joint Trustees"), by and through their undersigned counsel, respectfully submit this Memorandum of Law in Opposition to the Limited Motion (the "Motion") filed by Megainvest Overseas Limited ("Megainvest") to Vacate this Court's Order Granting the Joint Trustees' Application pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding (the "1782 Application") and to Quash the Joint Trustees' Subpoena for the Production of Documents to the Bank of New York ("BNY Subpoena").

## PRELIMINARY STATEMENT

The Joint Trustees filed a straightforward 1782 Application.  It sought fund flow documents to assist the Joint Trustees in locating assets and recovering property for the benefit of Mr. Motylev's estate being administered in England.  Simply applying section 1782's statutory criteria and the *Intel* factors to the facts here demonstrates that the 1782 Application should be granted.  Such applications are regularly granted in this district; and, relying on precedent, this Court likewise granted the Joint Trustees' application.  (Ex Parte Order Approving Application, ECF No. 7 ("Order").)  It is no surprise, then, that Megainvest's motion to vacate this Court's Order ignores the plain language of the statute and Second Circuit precedent, in a clear—though unsuccessful—attempt to thwart the Joint Trustees' efforts to recover property Mr. Motylev fraudulently transferred prior to his bankruptcy.

The primary basis on which Megainvest makes its motion, and on which virtually its entire motion rests, is that the 1782 Application's true purpose is to bring a claim against Megainvest in England.  To call Megainvest's argument specious is to give it more credit than it

deserves.  Not only is the Joint Trustees' application perfectly transparent on its purpose,[1] but the law permits trustees to seek discovery in aid of a foreign bankruptcy proceeding even if that discovery will be used to bring separate claims for the benefit of the estate.  The 1782 Application and this Court's Order cites that case law, yet it is nowhere to be found in Megainvest's papers.  Worse, in submitting its groundless and unsubstantiated motion to this Court, Megainvest has the audacity to state that the Joint Trustees' application was made in "bad faith."   By substituting aspersion for precedent, Megainvest does nothing more than insult this Court.

Megainvest further claims that the Joint Trustees are obligated to pursue discovery in England, and to obtain that discovery from Megainvest rather than Bank of New York.  But the law is the opposite.  In a decision issued earlier this year, this Court—relying on extensive Second Circuit precedent—unequivocally stated that "[t]he law is . . . clear that a party seeking discovery pursuant to Section 1782 need not first seek discovery from the foreign tribunal."  *In re Pidwell*, 21-MC-0166 (ALC) (KHP), 2022 WL 192987, at *5 (S.D.N.Y. Jan. 21, 2022).  Megainvest's papers carefully avoid all mention of that Second Circuit precedent and the opinion of this Court.

Megainvest also argues that the requests pertaining to Megainvest in the BNY Subpoena are irrelevant and not sufficiently narrowly tailored.  However, any transfers Meganvest received from or made to an entity with which Motylev is associated is relevant to the Joint Trustees' proceedings in England as they could assist the Joint Trustees in unwinding those transfers.  Furthermore, Megainvest is not the respondent here.  The Joint Trustees are working with the

---

[1] *See* 1782 Application, ECF No. 1, at 3 ("The documents sought from the Subpoenaed Entities are necessary to identify and locate the assets so that the Petitioners may duly commence actions to recover them through the English Bankruptcy Proceeding."); *see also* Memorandum of Law, ECF No. 4, at 5, 7, 8, 9 (same); Declaration of Kevin Hellard, ECF No. 5, ¶¶ 35, 131 (same).

Bank of New York to negotiate a production that will not place an undue burden on the Bank of New York.  Resolution of that negotiation depends on how the Bank of New York keeps it records and searches for documents, not on Megainvest's desire for the Bank of New York to produce as little as possible.  Moreover, the Joint Trustees previously offered to discuss with Megainvest narrowing the requests to avoid the current application. Showing its true aim, Megainvest rejected that proposal out of hand.

Megainvest's motion is a transparent attempt to block the Joint Trustees from obtaining documents that may demonstrate Megainvest received fraudulent transfers from Mr. Motylev. The law in this Circuit is clear that the Joint Trustees are well within their rights to do so.  As such, Megainvest's Motion should be dismissed.

**FACTS**

The following provides a brief background on Mr. Motylev and the English Bankruptcy Proceeding.  It also provides context for Megainvest's involvement in those proceedings, as well as the BNY Subpoena that seeks documents concerning Megainvests's transactions.

*Mr. Motylev*

As more particularly described in the 1782 Application, Mr. Motylev was a Russian banker who was responsible for the collapse of several banks and pension funds that he controlled.  (Declaration of Kevin Hellard in Support of the 1782 Application ("Hellard Decl."), ECF No. 5, ¶¶ 5-6.)  Mr. Motylev used his position of power at each of the banks and pension funds he looted to escape oversight and detection.  (*Id*. ¶¶ 23, 27.)  Mr. Motylev perpetrated his fraud by opening or causing his associates to open sham entities that would serve as borrowers from the banks he controlled.  (*Id*. ¶¶ 23, 25.)  The loans, which amounted to over RUB 33 billion, were executed on terms unfavorable to the banks and were supported by false transaction

documents.  (*Id*.)  Soon after the loans closed, the borrower entities ceased servicing the loans, eventually leading to the demise of the Motylev Banking Group.[2]  (*Id*. ¶¶ 23, 27.) Through various proceedings in Russia, as a result of the fraud he and his associates perpetrated, Mr. Motylev has been held liable for these institutions' debts, and has been indicted for various crimes including embezzlement, money laundering, and falsification of account documents.  He is also wanted in Russia.  (*Id*. ¶ 24.)

*English Bankruptcy Proceedings*

In 2015, soon after the collapse of these banks and pension funds, Mr. Motylev fled Russia to England. (*Id*. ¶¶ 5, 21.)  In 2018, Mr. Motylev was declared bankrupt in Russia and in November 2020, the English Bankruptcy Proceedings were initiated, and the Joint Trustees appointed. (*Id*. ¶¶ 9, 12.)

As part of the English Bankruptcy Proceedings, the Joint Trustees are conducting an investigation into Mr. Motylev's background and operations, including the companies, assets, and accounts though which it is believed he perpetrated his fraud.  (*Id*. ¶ 15.)  Since their appointment, the Joint Trustees have undertaken a significant amount of work in investigating and attempting to realize Mr. Motylev's assets. (*See* Declaration of Jonathan Thielmann in Support of the Joint Trustees' Opposition to Megainvest's Motion to Vacate and Quash Subpoena, submitted contemporaneously herewith ("Thielmann Decl."), ¶ 7.)  The Joint Trustees have obtained nearly 400,000 documents from Mr. Motylev and his family members, financial advisors, legal professionals, banks, and others and are continuing to take discovery in order to piece together Mr. Motylev's estate. (*Id.*) The Joint Trustees have gathered this material pursuant to, *inter alia*: (i) the information-gathering powers available to trustees in bankruptcy under the

---

[2] As defined in the 1782 Application.

Insolvency Act 1986, including sections 333 and 366; (ii) documents obtained as a result of search orders granted against Mr. Motylev's residential address and office premises; and (iii) requests made on behalf of Mr. Motylev for documents from various banks outside of the U.S. (*Id.*)  The Joint Trustees are continuing their investigation, and, as part of that effort, on December 27, 2021, the Joint Trustees filed the 1782 Application seeking permission from this Court to serve subpoenas on eight banks that the Joint Trustees believe Mr. Motylev used as correspondent banks to transact in U.S. Dollars.  (*See generally* 1782 Application & Exs., ECF No. 1.)

As set forth in the 1782 Application, Mr. Motylev disclosed an interest in 267 companies, which engaged in significant financial activity during the period when Mr. Motylev embezzled funds from various banks and pension funds.  (Hellard Decl. ¶ 30.)  However, the Joint Trustees' investigation has revealed that Mr. Motylev's fraud extended far beyond just the companies that he disclosed.  Indeed, the Joint Trustees have identified over 100 companies likely owned or somehow connected to Mr. Motylev that he used for purposes of laundering money and putting assets beyond the reach of creditors.  (*Id.* ¶ 31.)  The Joint Trustees filed the 1782 Application in respect of 21 such companies for which the Joint Trustees identified transactions in U.S. dollars that passed through U.S. correspondent banks.

*Megainvest's Connection to Mr. Motylev*

One such potentially fraudulent transaction was the sale of the RESO Pension Fund by Megainvest to Mr. Motylev (the "RESO Transaction").  The RESO Transaction was described briefly in the 1782 Application.  (Hellard Decl. ¶¶ 123-27 & Exs. 36, 37.)  Also included in the 1782 Application were the reasons the Joint Trustees believed at least a portion of the consideration paid by Mr. Motylev to Megainvest was a fraudulent transfer.  (*See id.*)  As the

RESO Transaction and Megainvest's connection to Mr. Motylev is the basis for the current Motion, the following provides additional details.

The RESO Transaction involved the sale of the RESO Pension Fund to Mr. Motylev for approximately $18.6 million local consideration plus $107 million at closing plus $20.5 million deferred until a later date. (Thielmann Decl. ¶ 11.) This price was over 40% of the value of the pension fund's assets, in contrast to the market price for pension funds at the time that, according to the Joint Trustees' research, would have been in the range of 10-15% of assets. (Hellard Decl. ¶ 123 & Ex. 36; Thielmann Decl. ¶ 11.) About $79 million of the funds used by Mr. Motylev to fund the RESO Transaction originated from Motylev-run Russian Kredit Bank ("RKB"). (Thielmann Decl. ¶ 11.) RKB transferred this amount to nine different companies, that in turn transferred the funds to the Motylev-controlled Technomark LLC's bank account at Russian Standard Bank. (*Id.*) Russian Standard Bank then lent Mr. Motylev about the same amount, which he used to close on the RESO Transaction. Within eight days of completing the RESO Transaction, the funds in Technomark's account at Russian Standard Bank were used to repay the loan. (*Id.*) There does not appear to be any legitimate commercial rationale for the transaction being structured this way. This is not merely the Joint Trustees' speculation: this transaction was the basis for Mr. Motylev being charged with money laundering under Article 174.1 of the Russian Criminal Code.

The RESO Transaction was effected by Mr. Motylev and Megainvest entering into an amended and restated sale and purchase agreement on November 17, 2014 ("SPA"). (Hellard Decl. Ex. 37; Thielmann Decl. ¶ 12.) Megainvest was not the owner of RESO, but instead was able to "exercise control" over Forzelius Investment Limited ("Forzelius"), owner of 99.999% of the issued share capital of RESO for purposes of the sale. (*Id.*) Forzelius is an entity connected

to the Sarkisov brothers, owners of Megainvest.  (Thielmann Decl. ¶ 12 n.1.)  Mr. Andrey

Saveliev, CEO of the RESO Group, owned the remaining 0.001%.  (*Id.* ¶ 12.)  Per the SPA, the

purchase price to be paid on the Completion Date was comprised of an agreed upon Initial

Amount of $127,443,928, less what the SPA terms "Local Consideration": (a) RUB 783,001,370

(approximately $18,659,461 using the contract RUB-USD exchange rate of 41.9627) to be paid

to Forzelius for its 99.999% shareholding in RESO; and (b) RUB 7,830 (approximately $186) to

be paid to Mr. Saveliev for the 0.001% shareholding in RESO he owned, less an amount that

accounted for certain debt.  (Hellard Decl. Ex. 37; Thielmann Decl. ¶ 13.)  On November 21,

2014, Mr. Motylev authorized the payment of $107,616,313 from his personal Credit Suisse

bank account to Megainvest's Credit Suisse bank account.  (*Id.*)  The Joint Trustees believe this

was mostly, or completely, an overpayment designed to be held for Mr. Motylev and to put

assets beyond the reach of creditors.  (Thielmann Decl. ¶ 13.)  The Joint Trustees repeatedly

questioned Mr. Motylev concerning the price paid for the RESO Transactions as compared to the

price Mr. Motylev paid for other pension funds, as well about the price of pension funds in

Russia at the time.  Mr. Motylev could not substantiate this significant overpayment.  (*Id.*)

Under the SPA, additional consideration of $20,531,200 (the "Deferred Amount") was to

be deferred until a certain triggering event.  (Hellard Decl. Ex. 37; Thielmann Decl. ¶ 14.)  A

notice informing Mr. Motylev of the triggering event was issued on September 30, 2015, and

accordingly, the Deferred Amount was due within 10 business days.  (Thielmann Decl. ¶ 14.)

Mr. Motylev did not make the payment, and this failure to pay was subject to a separate dispute

between Megainvest and Mr. Motylev in England (the "RESO Dispute").  (*Id.*)

The circumstances surrounding the resolution of the RESO Dispute have led the Joint

Trustees to believe that it involved additional sham transactions between Megainvest and Mr.

Motylev.  Between September and November 2015, Mr. Motylev met with Mr. Saveliev, as representative of Megainvest, in what Mr. Motylev termed "settlement meetings," i.e., discussions to settle the RESO Dispute.  (*Id.* ¶ 16.)  In late December 2015, Mr. Saveliev served Mr. Motylev with a freezing order. Yet Mr. Motylev began preparing a response to the freezing order *five months before it was served*, and almost immediately after he left Russia.  (*Id.* ¶ 15.) As a result, Mr. Motylev responded to the freezing order merely days later with a detailed disclosure, in what the Joint Trustees believe was a choreographed process designed to put assets outside the reach of creditors.  (*Id.* ¶¶ 15-16.)  On March 19, 2016, Mr. Motylev entered into a complicated settlement agreement with Megainvest.  (*Id.* ¶ 16.)  All of the major known assets belonging to Mr. Motylev and his wife, including three villas in France, a property in Spain, and a yacht berth in France were transferred away as a result of this settlement.  The Joint Trustees believe that most of these assets were transferred to Megainvest and/or its affiliates in satisfaction of a debt the Joint Trustees believe was worth significantly less than the assets.  (*Id.*)

The transfer documents produced by Credit Suisse show that Megainvest used Bank of New York as the correspondent bank for U.S. Dollar denominated transactions.  (Hellard Decl. Ex. 37.)  The Joint Trustees seek to identify: (i) the onward movement of funds transferred by Mr. Motylev to Megainvest; and (ii) the inflows and outflows of funds that could have originated from, or whose destination was, Mr. Motylev and/or any of the companies that the Joint Trustees know or believe to be associated with him. Should the information provided by Bank of New York demonstrate that Mr. Motylev and the entities he owns or controls made fraudulent transfers to the detriment of his creditors, the Joint Trustees intend to bring claims to unwind those transactions.  (*Id.* ¶ 17.)

**ARGUMENT**

Courts are authorized to grant an application made pursuant to 28 U.S.C. § 1782 where "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012); *see also In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 128 (2d Cir. 2017); *Certain Funds, Accounts and/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 117 (2d Cir. 2015)). If these statutory requirements are met, the Court is free to grant discovery at its discretion. *See Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83-84 (2d Cir. 2004). The Supreme Court has identified a number of factors—the so-called "*Intel* factors"—that district courts are to consider in ruling on a section 1782 application: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the proceeding underway abroad, and the receptivity of the foreign court to federal-court assistance; (3) whether the application conceals an attempt to circumvent foreign proof gathering restrictions of a foreign country; and (4) whether the application is unduly intrusive or burdensome. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-65 (2004); *Brandi-Dohrn*, 673 F.3d at 80-81.

On March 4, 2022, this Court granted the 1782 Application, finding that the Joint Trustees have met the statutory requirements under section 1782. (Order at 2-3.) This Court also found that all four discretionary *Intel* factors weigh in favor of granting the application. (*Id.* at 3-4.) Megainvest now seeks to vacate this Court's Order as it applies to Megainvest-related documents sought from Bank of New York based on the fact that: (i) the 1782 Application did

not meet the second statutory requirement; and, (ii) the first, third and fourth *Intel* factors weigh

against the 1782 Application.  As set forth below, Megainvest is wrong on both counts.

I.   **THE DISCOVERY SOUGHT BY THE JOINT TRUSTEES IS FOR USE IN A FOREIGN PROCEEDING**

The Joint Trustees' 1782 Application seeks discovery for use in a foreign proceeding—

the English Bankruptcy Proceeding.  (Order at 2.)  The law is clear that a foreign bankruptcy is a

foreign proceeding for purposes of section 1782.  *See Lancaster Factoring Co. v. Mangone*, 90

F.3d 38, 42 (2d Cir. 1996).  Yet, Megainvest argues that the Joint Trustees have not met section

1782's second statutory requirement because the purpose of the discovery they seek is to bring

claims against Megainvest in England which is a different foreign proceeding than the English

Bankruptcy Proceeding, making the 1782 Application purportedly improper.  (*See* Megainvest's

Memorandum of Law in Support of its Motion ("Megainvest Br."), ECF No. 12, at 10.)  Whether

purposefully or not, Megainvest's argument misstates the law.  Even worse, Megainvest accuses

the Joint Trustees of misleading this Court about their true intentions, calling their 1782

Application "pretextual."  (Megainvest Br. at 10, 13.)  However, as this Court knows, the 1782

Application was completely transparent about the Joint Trustees' intentions: "The documents

sought from the Subpoenaed Entities are necessary to identify and locate the assets so that the

Petitioners may *duly commence actions* to recover them through the English Bankruptcy

Proceeding."  (1782 Application at 3 (emphasis added); *see also* Hellard Decl. ¶¶ 35, 131;

Memorandum of Law at 5, 7, 8, 9.)  This Court acknowledged those intentions in rendering its

decision.  (*See* Order at 1 ("Petitioners, who serve as Joint Trustees in the English bankruptcy

proceedings of Motylev, seek this Application to trace the funds misappropriated by Mr.

Motylev and his associates and to bring claims in the English Bankruptcy Proceeding to recover

those assets wherever they may be found for the benefit of the bankruptcy estate.").)

In support of its position, Megainvest cites a mix of cases that are either inapposite or, in fact, support the Joint Trustees' position.  Megainvest fails to cite a single case directly on point, despite the existence of several such cases in this district.  Not surprisingly, those cases all support the Joint Trustees' ability to seek discovery for the purpose of considering potential claims to unwind fraudulent transactions.  In *In re Application of Hill*, No. M19-117 (RJH), 2005 WL 1330769 (S.D.N.Y. June 3, 2005), Ernst & Young moved to vacate a 1782 order and to quash subpoenas served on them by Honk Kong court-appointed liquidators.  Like Megainvest here, in *Hill*, Ernst & Young asserted that the requested discovery was not for use in the Hong Kong liquidation proceeding, and the liquidators were "'brazenly trawling for information to determine whether any claims [against third parties] exist,' that such claims must be asserted in separate proceedings and therefore, that the discovery will be 'for use' in those proceedings as opposed to the Hong Kong liquidation proceeding."  2005 WL 1330769, at *4 (citing Ernst & Young's papers).  Relying on the Second Circuit's opinion in *Lancaster Factoring*, the District Court concluded that "the fact the Liquidators may use the fruits of discovery to pursue potential claims against third parties does not undermine their equally legitimate goals of reconstructing financial records, evaluating key transactions and identifying and recovering the debtors' assets." *In re Hill,* 2005 WL 1330769, at *5; *see also In re Gissin* 649 Fed. App'x 27 (2d Cir. 2016) (citing *Hill* and *Lancaster* for the same proposition and arriving at the same conclusion).  The District Court took its analysis one step further, finding that "even if the requested evidence is not used specifically in [the] liquidation proceedings, the Supreme Court has noted that a broad range of discovery under § 1782 is available in civil investigations so long as a proceeding is "within reasonable contemplation."  *Id.* at *5 n.4 (quoting *Intel*).

The landscape here is the same as in *Hill*.  The Joint Trustees are court-appointed Trustees charged with realizing and distributing the debtor's assets and managing the debtor's estate.  (Declaration of Richard Mark Fisher QC in Support of the Joint Trustees' Opposition to Megainvest's Motion to Vacate and Quash Subpoena, submitted contemporaneously herewith ("Fisher Decl."), ¶ 8.)  "The powers of the trustee are inevitably very extensive in order that he may carry out his task effectively: they include the power to trace and recover property of the bankrupt which may have passed into others' hands and also to set aside antecedent transactions and recover property of which the bankrupt may have purported to dispose at some time prior to his adjudication." (*Id.* ¶ 9 (internal citations and quotations omitted).)  Thus, there is no doubt that the Joint Trustees' 1782 Application meets the second statutory requirement of seeking information "for use" in a foreign proceeding.

Megainvest also submits a declaration of Mr. Richard Hacker, Q.C. to support its contention that transaction avoidance claims under English law—the type of claims the Joint Trustees could bring against Megainvest to unwind avoidable transfers—are distinct from bankruptcy claims.  However, Mr. Hacker's declaration does Megainvest more harm than good. Mr. Hacker admits that the statutory provision that the Joint Trustees would utilize to avoid a suspect transaction is section 423 of the *Insolvency Act of 1986*.  In fact, the Insolvency Act includes in the powers of a bankruptcy trustee "'2. Power to bring, institute or defend any action or legal proceedings relating to the property compromised in the bankrupt's estate [and] 2A. Power to bring legal proceedings under s.339, 340 *or 423*.'"  (Fisher Decl. ¶ 11 (emphasis added); *see also* ¶ 16.)  And although Mr. Hacker tries to draw a distinction between section 423 and other provisions of the Insolvency Act, that distinction is irrelevant here, as Mr. Hacker admits that, in this case, the section 423 claim would be "brought under the umbrella of the

bankruptcy" and "[i]f the claims were prosecuted to a successful conclusion . . . the [Joint Trustees] would distribute the proceeds in the usual way." (Hacker Decl. ¶¶ 42, 50; *accord* Fisher Decl. ¶ 30 ("Where a trustee in bankruptcy obtains an order under section 423 of the 1986 Act, he will not benefit personally from the making of the order: any property vested in him by the court will be vested for the benefit of the creditors (being the victims of the transaction), and sums payable to him will (subject to the usual regime for payment of expenses and priorities in a bankruptcy) be available for distribution to the bankrupt's creditors under section 324 of the 1986 Act.  Recoveries under section 423 of the 1986 Act, like recoveries under sections 339 and 340 will therefore become part of the bankruptcy estate."))

Megainvest asked Mr. Hacker to opine on: "Whether the documents sought pursuant to the Megainvest Requests are relevant to locating or tracing assets in the English Bankruptcy." (Hacker Decl. ¶ 8(a).)  Mr. Hacker contorts himself to provide the following answer: "The documents sought pursuant to the Megainvest Requests do not assist the English Bankruptcy in the sense of "tracing" which assets formed part of the bankruptcy estate at the commencement of the English Bankruptcy."  (*Id.* ¶ 9(a).)  The "commencement" of the bankruptcy is irrelevant here, other than to provide a contrived qualification to permit Mr. Hacker to answer Megainvest's question in the negative.  (*Contra* Fisher Decl. ¶ 28 ("[T]he bankruptcy estate is not treated as 'static' or settled as at the date of the bankruptcy. Professor Fletcher (op cit at 8-001 and 8-033) describes the bankruptcy estate (correctly in my opinion) as 'capable of extension both backwards and forwards from that moment in time' and capable of being 'augmented by property which other provisions of the Act cause to be included in the estate.'"). The only relevant question is whether the information the Joint Trustees seek would assist them in the English Bankruptcy Proceeding, and the answer is a resounding "yes."

Megainvest then argues that the Joint Trustees are using section 1782 as a fishing expedition.  (Megainvest Br. at 1, 10-12.)  But Megainvest admits that the 1782 Application is not a fishing expedition when it accuses the Joint Trustees of using section 1782 to support very specific claims against Megainvest.  In addition to being nonsensical, this argument is also untrue.  The Joint Trustees' 1782 Application identified the evidence which led the Joint Trustees to inquire into the entities identified the 1782 Application, including Megainvest.   The cases Megainvest cites in support of its position are completely inapposite, so much so, that it is unclear why Megainvest relies on them.  In *In re Application For An Order Permitting Metallgesellschaft AG To Take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997), the Second Circuit held that the District Court abused its discretion in quashing a subpoena, finding that the District Court's consideration of the fact that the parties were scheduled to appear in court in Germany where the matter could be raised for the foreign tribunal's consideration—the very consideration Megainvest wants this Court to take into account—was improper.  In *In re Postalis*, No. 18-MC-497(JGK), 2018 WL 6725406, at *5 (S.D.N.Y. Dec. 20, 2018), the petitioner sought to use the evidence obtained through its 1782 application to sue the subpoena target in the *United States* and it was therefore not for use in a foreign proceeding.  And in *Lazaridis v. Int'l Ctr. for Missing and Exploited Children, Inc.*, 760 F. Supp. 2d 109 (D.D.C. 2011), the applicant sought discovery for use in a criminal proceeding, but was unable to tie his requests to those criminal proceedings, leading the court to conclude that the documents the applicant sought were "more for his general use than for use by the Greek tribunals."  *Id.* at 115.  Here, the Petitioners are bankruptcy trustees, creatures of statute.  They have no use for the documents they seek other than to aid them in managing and recovering property for the benefit of the Motylev estate.

Megainvest also argues that seeking discovery for future claims is impermissible. (Megainvest Br. at 11.)  Again, Megainvest fails to rely on a single case that supports its contention.  That is because Megainvest's argument is both contrary to the statute itself and the salient law.  For example, *Certain Funds, Accts. and/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113 (2d Cir. 2015), which is cited by Megainvest, stands for the proposition that while a creditor or interested party in a foreign liquidation does not have the right to seek documents because it cannot show that it has the ability to put the evidence before the court, "there is nothing preventing the trustees [themselves] from seeking discovery in U.S. courts pursuant to § 1782." *Id.* at 122.  Here, of course, it is the trustees seeking the relevant information, and thus *Certain Funds* fully supports the Joint Trustees' position.  In *Ayyash v. Crowe Horwath LLP*, No. 17-MC-482 (AJN), 2018 WL 2976017 (S.D.N.Y. June 13, 2018), the Court considered the application a fishing expedition because the applicant could not formulate whether he would be able to bring claims in Lebanon against the parties concerning which he sought discovery. Again, these are not the facts here; just the opposite.  Megainvest admits that the Joint Trustees have articulated the very claims they intend to bring against Megainvest.  And the Joint Trustees have identified in the 1782 Application how the information they seek from the Bank of New York could be useful in the foreign proceeding.

Megainvest's arguments concerning section 1782's second statutory requirement should be disregarded.

## II.   THE FIRST *INTEL* FACTOR FAVORS PERMITTING THE SUBPOENA TO ISSUE

Megainvest argues that the Joint Trustees should not have brought this 1782 Application because they are obligated to first pursue discovery in England.  No such discoverability requirement exists in 28 U.S.C. § 1782.  In *In re Application of Malev Hungarian Airlines*, 964

F.2d 97 (2d Cir. 1992), Pratt & Whitney, an airplane engine manufacturer, sued Malev

Hungarian Airlines in Hungary.  A few days after answering the complaint, Malev filed a 1782

application seeking discovery from Pratt & Whitney in the United States.  *Id.* at 98-99.  The

District Court denied Malev's application finding that "Malev's request was 'premature and

unnecessary'" because Malev "should have first sought the requested discovery from the

Hungarian court."  *Id.* at 100.  The Second Circuit reversed, finding "nothing in the text of 28

U.S.C. § 1782 [to] support a quasi-exhaustion requirement of the sort imposed by the district

court."  *Id.*  The Second Circuit concluded that "the district court abused its discretion" "[t]o the

extent the district court rested its decision to deny discovery to Malev because a request for

discovery from Pratt & Whitney had not first been made to the Hungarian court in Budapest . . .

."  *Id.* at 101.  In several other decisions—upon two of which Megainvest actually relies—the

Second Circuit admonished the district court for interpreting section 1782 as requiring the

petitioner to exhaust discovery abroad.  *See Metallgesellschaft*, 121 F.3d at 79 ("A district court

may not refuse a request for discovery pursuant to § 1782 because a foreign tribunal has not yet

had the opportunity to consider the discovery request. . . . Such a 'quasi-exhaustion requirement,'

finds no support in the plain language of the statute and runs counter to its express purposes, as

"[i]t would undermine the policy of improving procedures for assistance to foreign and

international tribunals by imposing an additional burdens on persons seeking assistance from our

federal courts . . . .") (citing *Malev*); *Euromepa S.A. v R. Esmerian, Inc.*, 51 F.3d 1095, 1098 (2d

Cir. 1995) ("In this case, the district court denied MEPA's discovery request after conducting an

analysis that runs counter to the principles set forth in *Malev*, *Aldunate*, *John Deere, Ltd.* and, we

believe, in the statute itself.  To start, the district judge noted that 'a mechanism was available for

MEPA to seek [specific] documents while in French courts,' and then remarked disapprovingly

that 'MEPA failed to even attempt to use the mechanism provided by French procedure for obtaining documents.' In essence, this criticism faults MEPA for having failed to exhaust its discovery options in France before seeking assistance in this country, and thus embodies the 'extra-statutory barrier[ ] to obtaining discovery' that we explicitly rejected in *Malev*.) (internal citations omitted).  In fact, this Court recently underscored that "[t]he law is . . . clear that a party seeking discovery pursuant to Section 1782 need not first seek discovery from the foreign tribunal."  *Pidwell*, 2022 WL 192987, at *5 (citing *Gorsoan Ltd. v. Bullock*, 652 F. App'x 7, 9 (2d Cir. 2016) and *Malev*, 964 F.2d at 100)).

As this Court has stated, the "critical issue when evaluating the first *Intel* factor" is whether the party against whom discovery is sought is a party to the foreign proceeding.  *Id*. (finding irrelevant that a related entity was a party to the foreign litigation).  Here, the subpoena target is the Bank of New York, a bank found in this district, and certainly not a party in the English Bankruptcy Proceeding or any actions related thereto.  Megainvest argues that the same information the Joint Trustees seek from Bank of New York could be obtained from Megainvest. That argument is fraught for several reasons.  *First*, there is no action against Megainvest pending in England in which the Joint Trustees could seek such information.  Megainvest's argument turns the Joint Trustees' 1782 Application on its head: the very purpose of the application is to identify assets Mr. Motylev put beyond the reach of his creditors in order to decide *whether* to bring claims to unwind those transaction as part of the English Bankruptcy Proceeding.  *Second*, even if there were an action pending against Megainvest, the types of documents the Joint Trustees seek—wire transfers and account documents—are much more likely to be found at the Bank of New York than in the possession of Megainvest, and Megainvest makes no representations that it has those documents or that it will produce them in

17

England.  *Third*, and perhaps most important, nothing in section 1782 or the case law prohibits the Joint Trustees from seeking these documents from Bank of New York.  *See Malev*, 964 F.2d 97, 100-01; *Gorsoan Ltd. v. Bullock*, 652 Fed. App'x 7, 9 (2d Cir. 2016).  The Joint Trustees are seeking information from a third-party bank not subject to the jurisdiction of the English courts.  Banks are typical respondents in 1782 Applications.  *See, e.g., In re Application of Hornbeam Corp.*, No. 14 Misc. 424, 2014 WL 8775453, at *5 (S.D.N.Y. Dec. 24, 2014); *Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*, 785 F. Supp. 2d 434, 437-39 (S.D.N.Y. 2011); (*see also* Order at 3.)  As such, the first *Intel* factor weighs in favor of the Joint Trustees.

## III.     THE THIRD *INTEL* FACTOR FAVORS PERMITTING THE SUBPOENA TO ISSUE

The third *Intel* factor asks courts to consider whether the Joint Trustees' application conceals an attempt to circumvent foreign proof-gathering restrictions.  *Intel*, 542 U.S. at 264-65.  "Only where the materials being sought are privileged or otherwise prohibited from being discovered or used is the third *Intel* factor implicated."  *In re Tiberius Group AG*, 19-MC-467 (VSB), 2020 WL 1140784, at *4 (S.D.N.Y. Mar. 6, 2020) (citing *In re Accent Delight Int'l Ltd.*, 791 App'x 247, (2d Cir. 2019) (affirming district court's grant of § 1782(a) application where petitioners admitted they could not obtain the evidence sought in the foreign proceedings, but objector had not made "any showing that the policy or restrictions of any relevant foreign jurisdiction prohibit[ed] the discovery sought by Petitioners.")).

Megainvest accuses the Joint Trustees of acting in bad faith; however, if there is anything less than good faith in this proceeding, it is the actions of Megainvest.  Megainvest bases its entire motion on arguing that section 1782 discovery should not be permitted here because the English Courts *could allow* the type of discovery the Joint Trustees seek.  It therefore strains

credulity that Megainvest cites the third *Intel* factor, which considers whether a foreign court *would prohibit* this discovery, as the basis to quash the Joint Trustees' subpoena here. Obviously, Megainvest has not made the required showing.  *In re Hornbeam*, 2014 WL 8775453, at *4 ("[T]he burden is on the opponent of a § 1782 request to prove that the foreign court would reject the evidence obtained through § 1782.")

## IV.  THE FOURTH *INTEL* FACTOR FAVORS PERMITTING THE SUBPOENA TO ISSUE

In granting the Joint Trustees' 1782 Application, this Court found "nothing to suggest that the application . . . is unduly burdensome."  (Order at 4.)  "The discovery sought is solely to identify the fund flows and this information is squarely within the Banks records which are routinely sought and produced via § 1782 petitions."  *Id.* (citing *In re Hornbeam Corp.*, 2014 WL 8775453, at *5 (ordering production of bank records, including wire transfers, pursuant to § 1782)).

Indeed, the documents sought in the Bank of New York Subpoena at requests 13, 28, 45, and 91 are records of transactions at Bank of New York that involved Megainvest for purposes of identifying fund flows to or from Motylev and any companies associated with him. (Thielmann Decl. ¶ 17.)  The document requests are admittedly broad; but that is intended to reduce the burden on third-party banks.  For example, banks often run search terms of target names through their records.  These searches may result in solution sets of -0- or hundreds of thousands of documents.  Making the requests too specific puts the burden on the banks to review all the transaction documents and is often unnecessary when the solution set is manageable.  To make the requests more narrowly tailored, the Joint Trustees would have had to list every Motylev associated entity (of which there is nearly 400) that could have engaged in transactions with Megainvest, and asked the Bank of New York to produce documents that

originated from Megainvest to any of these several hundred entities, or vice versa.  Instead, they chose the path less burdensome to the bank and included the four requests, with the understanding that they would work with the bank to narrow the request or search if the solution sets were too extensive.  The Joint Trustees are currently in negotiations with Bank of New York itself and are working through these issues. (Declaration of Tatiana Markel, Esq. in Support of the Joint Trustees' Opposition to Megainvest's Motion to Vacate and Quash Subpoena, submitted contemporaneously herewith ("Markel Decl."), ¶ 6.).

Megainvest objects to these requests on the grounds of relevance and proportionality. With respect to relevance, Megainvest makes two specious arguments.  First, Megainvest argues that "the English Bankruptcy Court does not have authority to trace assets related to the RESO Transaction . . . ."  Second, Megainvest argues that "the BNY Requested Subpoena does not even purport to limit itself to the RESO Transaction."  Megainvest is wrong both as a matter of fact and law.  As to the first contention, it is not the English Bankruptcy Court that is tracing these assets, it is the Joint Trustees.  And the Joint Trustees have the authority to investigate and locate assets that could have been fraudulently transferred by the debtor.  (*See* Fisher Decl. ¶¶ 11-15.).  Megainvest's second contention is unclear.  The Joint Trustees' efforts are not limited to the RESO Transaction.  The Joint Trustees seek documents to identify: "(i) the onward movement of funds transferred by Mr. Motylev to Megainvest; and (ii) the inflows and outflows of funds that could have originated from or whose destination was Mr. Motylev and/or any of the companies that the Joint Trustees know or believe to be associated with him."  (Thielmann Decl. ¶ 17.)  That includes documents concerning the RESO Transaction and the RESO Dispute, as well as other documents that could show transfers to any of the Motylev-associated entities.  All such documents would be relevant to the Joint Trustees' efforts as they could lead to identifying

fraudulent transfers made to the detriment of Motylev's creditors. *See In re Catalyst Managerial Svc. DMCC*, 680 Fed. App'x 37, 39-40 (2d Cir. 2017) (finding wire transfer and transactional documents sought from 16 banks as relevant to the foreign proceeding despite intervenors' objection).

With respect to Megainvest's argument that the requests are not narrowly tailored, the Joint Trustees must raise with this Court the fact that Megainvest made no effort whatsoever to work with the Joint Trustees to narrow the requests. Megainvest's counsel asked the Joint Trustee's counsel to meet and confer before filing a letter motion to intervene with this Court. (Markel Decl. ¶ 3.) Although this Court's rules require the movant to meet and confer "in good faith,"—for the purpose of narrowing the scope of the dispute—that is not what happened here. Counsel for the Joint Trustees asked whether Megainvest wanted to narrow the scope of the four requests to Bank of New York and that if it did, the Joint Trustees would consider it. (*Id.* ¶ 4.) Megainvest's counsel rejected that offer stating, in no uncertain terms, that the only scenario under which Megainvest would refrain from making the instant motion was if the Joint Trustees withdrew those requests altogether. (*Id.*) Now Megainvest concedes that, at the very least, requests concerning the RESO Transaction would have been sufficiently narrowly tailored. (Megainvest Br. at 17.) Although the Joint Trustees believe they are entitled to significantly more information than just the RESO Transaction, Megainvest's concession underscores that the meet and confer was not in good faith, but rather a perfunctory gesture. That is a derogation of this Court's order and grounds for this Court to deny Megainvest's motion. *See Agoado v. Midland Funding LLC*, CV 14-18 (WFK) (AKT), 2021 WL 4355864, at *2 (E.D.N.Y. Sept. 23, 2021) ("Failure to comply with the Local Rules is sufficient grounds to warrant denial of a motion.)

In discussing the fourth *Intel* factor, Megainvest makes several other baseless arguments. Megainvest again raises the Joint Trustees' ability to obtain documents in England.  As explained above, discoverability of the documents in the foreign proceeding is not at issue in a 1782 analysis.  *See supra* Part II; *see also In re Catalyst Managerial Svc.*, 680, Fed. Appx. at 40 (rejecting an intervenor's contention that the requested documents could be obtained in the UK as applicable to the fourth *Intel* factor).  Megainvest's statement concerning the time period for which banks are required to keep records is likewise irrelevant to the 1782 Application.  That is an issue between the Joint Trustees and the Bank of New York, who will no doubt inform the Joint Trustees about the length of time it keeps its records in negotiating its production. Although Megainvest is permitted to intervene to seek to vacate this order, it is not a respondent here.  Because respondents have an opportunity to challenge the subpoena, the fourth *Intel* factor weights in favor of denying Megainvest's motion to vacate.  *See In re JSC BTA Bank*, No. 21 Misc. 824 (GHW) (GWG), 2021 WL 6111916, at *4 (S.D.N.Y. Dec. 27, 2021).

Finally, if this Court were to find that Megainvest properly raised this issue, and that the Joint Trustees' requests are somehow unduly intrusive, the proper course would be to narrow the requests, not quash them.  *See Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir. 2015) ("It is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright. Thus, to the extent a district court finds that a discovery request is overbroad, before denying the application it should ordinarily consider whether that defect could be cured through a limited grant of discovery.") (internal quotations and citations omitted).

## V.      MEGAINVEST DOES NOT HAVE STANDING TO QUASH THE SUBPOENA

Megainvest also moves to quash the BNY Subpoena under Fed. R. Civ. P. 45.  However, its right to intervene here on the scope of the discovery sought is limited to objecting to whether the Court properly weighed the fourth *Intel* factor in granting the 1782 application.  Megainvest lacks standing to quash the subpoena unless it "seeking to protect a personal privilege or right." *Nova Products, Inc. v. Kisma Video, Inc.*, 220 F.R.D. 238, 241 (S.D.N.Y.2004); *see also Estate of Ungar v. Palestinian Auth.*, 332 F. App'x 643, 645 (2d Cir. 2009) (collecting cases); Fed. R. Civ. P. 45(d)(3).  "[A] challenge to a subpoena based on grounds of relevance or burden may only be raised by the entity to which the subpoena is directed . . . ." *United States Regional Econ. Dev. Auth., LLC v. Matthews*, No. 3:16-cv-10193(CSH), 2018 WL 2172713, at *8 (D. Conn. May 10, 2018).  Therefore, Megainvest's statements that "the BNY Subpoena Requests seek documents that go well beyond what is relevant for the English Bankruptcy Proceeding" are of no moment in respect of its motion to quash.  The remainder of Megainvest's arguments cite case law outside of this district and rehash the same baseless points made elsewhere in its brief that the Joint Trustees should seek this evidence in England first.  As explained above, that is not a requirement of section 1782.

As Megainvest has made no showing that it is seeking to protect privileged information, its motion to quash should be denied.

## CONCLUSION

For the foregoing reasons, the Joint Trustees respectfully request that the Court deny

Megainvest's Limited Motion to Vacate this Court's Order Granting the 1782 Application and to

Quash the Bank of New York Subpoena Requests 13, 28, 45, and 91.

Dated: May 23, 2022
New York, New York

**BAKER & HOSTETLER LLP**

_s/Oren J. Warshavsky_
Oren J. Warshavsky
owarshavsky@bakerlaw.com
Tatiana Markel
tmarkel@bakerlaw.com
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212-589-4200
Facsimile: 212-589-4201